**CAEMINT FOOD, INC., Plaintiff,**

v.

**LLOYD BRASILEIRO, COMPANHIA DE NAVEGACAO, Defendant.**

**79 Civ. 3433 (CBM).**

United States District Court,
S. D. New York.

Oct. 7, 1980.

---

Curtis, Mallet–Prevost, Colt & Mosle, New York City (T. Barry Kingham, S. Robert Schrager, New York City, of counsel), for plaintiff.

Walker & Corsa, New York City (Hollis M. Walker, Jr., Christopher H. Mansuy, Vera E. Weinberg, New York City, of counsel), for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This is an action brought by plaintiff, Caemint Food, Inc., the consignee of a large shipment of canned corned beef from Brazil. Plaintiff brings this action against the defendant carrier, Lloyd Brasileiro Compan-

hia De Navegacao, to recover for expenses and lost profits which plaintiff incurred as a result of mold and rust damage to a portion of the shipment. The total shipment, off–loaded in San Francisco, had been contained in 55,500 cartons. Each carton contained 24 or 48 cans. A total of 205,296 cans were found to contain mold on the labels and/or rust on the top and/or bottom rims. When placed in cartons the damaged cans amounted to 8,554 cartons.

The shipment had been loaded onto defendant's vessel, Lloyd Altamira, in Rio Grande, Brazil between August 15 and August 18, 1977. Nineteen bills of lading had been issued to plaintiff, each of which stated that the goods had been received "in apparent good order and condition." Two certificates furnished by the Brazilian authorities also attested to the good order and condition of the shipment when loaded on board the vessel.

The shipment consigned to plaintiff had been loaded in the No. 3 and 4 holds of the vessel along with another shipment which was off–loaded prior to the shipment in question in Los Angeles. Between 5 and 7 percent of the cartons which had been off–loaded in Los Angeles were found to be damp to wet to the touch and to contain wet stains, although no claim for mold or rust damage was filed as to this shipment.

When the cartons were off–loaded in San Francisco on September 24, 1977, inspection revealed that some cartons had wet stains and corrugation and mold appeared on the outside of some cartons, as a result of which the shipment was denied entry, except for 10,000 cartons which passed initial inspection. The bulk of the shipment had been denied admission by the United States Department of Agriculture. An inspection conducted on behalf of plaintiff was made by David Voss of the Bay Area Inspection Service. After the goods were denied entry, Voss initially segregated three (3) lots, or 12,000 cartons, as good for further inspection by the Department of Agriculture. These 12,000 cartons were again inspected and refused entry since individual cans were inspected and were shown to contain

mold. Forty–five thousand (45,000) cartons were eventually opened at a warehouse in San Francisco and every tin examined. By this examination the 205,296 cans found to contain mold were segregated and placed into 8,554 cartons. The damaged cans came from cartons which showed evidence of having been wet as well as from cartons which appeared to be sound. Voss testified on the trial that in addition to mold on the labels he saw rust on the top and bottom rim of some cans. Thirty–six thousand nine hundred and forty–six (36,946) cartons were found to be good. These cartons, plus the 10,000 which originally passed inspection, were eventually shipped by plaintiff to Libby, the company for whom the goods had been purchased. The 8,554 bad cartons were sold as salvage.

Plaintiff incurred expenses of $67,936.17 in connection with the inspection services of Bay Area Inspection Service, the surveyor employed by plaintiff, and the sale of the damaged goods. Plaintiff's lost profit, less the amount realized in the salvage sale, was $61,059.22. Total of the damages sought by plaintiff is $128,995.39.

The cans of corned beef had been purchased by plaintiff from Swift Armour S.A. in Rio Grande, Brazil. They had been produced at two different plants owned by Swift Armour in Brazil on 31 different dates over a period of 68 days. They had been shipped to a warehouse in Rio Grande on 8 different dates–8 lots by truck, 11 lots by rail–and loaded aboard the vessel on 3 different dates.

The goods thus shipped to the warehouse remained there from June 25 until loading aboard the vessel commenced on August 15, 1977. The warehouse was brick. There is no evidence that the cartons got wet in the warehouse or on route. However, the weather report from Rio Grande showed that there had been heavy rain and very high humidity during much of the time that these cartons were stored in the warehouse awaiting loading. The evidence also discloses that part of the shipment traveled in what was described as "unstable weather."

The vessel left Rio Grande, on August 18. It stopped enroute to the United States in Recife, Brazil for additional loading in the No. 4 hold. While the vessel was in port in Recife the weather report indicates that there was some light rain. The vessel log states that on August 31, 1977 at Recife the stevedores did not work because of rain. This was about three weeks before arrival in Los Angeles.

The photographs of the cartons off–loaded in San Francisco show the damaged condition of some of the cartons upon off–loading as testified to by Mr. Voss. These pictures show cartons with wet stain and corrugation. Significantly, the same pictures also reveal mold on the cartons. As noted above, inspection revealed that some of the cartons which were sound on the outside also contained from 2 to 6 moldy and rusted cans. Tests performed in San Francisco revealed that the water stains were the result of fresh water and not sea water. The 10,000 cartons which initially passed inspection were loaded on the very bottom of the No. 3 and No. 4 holds. The evidence shows that all the cartons were stowed in bulk and that a plastic covering and plywood had been placed at two tier intervals.

Charts showing the temperature and humidity indexes in the holds during the voyage, as recorded by the ship's temperature and humidity control system, were destroyed by defendant more than a year after notice of the damage and four months after formal notice of the claim.

The evidence established that the corn based paste which is used to secure the paper labels to each can of corned beef is susceptible to the development of mold which then appears on the labels. To avoid this problem a mold deterrent is used. The deterrent is manufactured by Dow Chemical Company and is known as Dowicide. The two Swift Armour Company plants in Brazil where the cans of corned beef involved here were produced, in mixing the paste for the labels, used twice the amount of Dowicide recommended by Dow in its literature. In addition, Dowicide was put on the varnish used on the cans.

Expert testimony on the trial established that mold spores are everywhere, but at least three conditions are necessary for the growth and proliferation of mold—moisture, darkness and lack of ventilation. The court finds that the shipment here was subjected to these three conditions during two separate periods of time. The first time was during the six weeks that the cartons were stored in the warehouse in Brazil when there was heavy rain and very high humidity for many days. The second time was in the holds of the vessel on the voyage from Brazil to Los Angeles, after fresh water got on the cartons during loading either at Rio Grande or Recife or both.

There is no direct proof that mold began to appear on the individual cans prior to loading. The court infers from the circumstantial evidence cited above that some mold developed during the time that the cartons were in the warehouse in Brazil.

There was no water damage to the cartons before loading as the bills of lading attest. However, some of the cartons off-loaded in Los Angeles contained wet stains and some were damp to wet on touch, circumstantial evidence from which the court infers that the cartons were either exposed to rain on loading in Rio Grande or Recife or both and that there was poor ventilation in the holds which caused the corrugation and mold on the outside of some of the cartons off-loaded in San Francisco and contributed to the proliferation of mold on the individual cans.

Defendant contends that plaintiff has failed to make out a prima facie case by failing to prove "actual" good order and condition of the contents of the cartons upon loading on its vessel in Brazil and therefore is not entitled to recover.

Defendant next contends that plaintiff's recovery is barred since its shipment contained an inherent vice which is responsible for the damage.

Finally, defendant says that if the court should find that there was a concurrent cause of the damage in its fault or neglect or the fault or neglect of one of its agents, then defendant has carried its burden of proving that proportion of the loss which is attributable to its own fault and neglect and that proportion which is attributable to the inherent vice or the fault and neglect of plaintiff.[1]

■ Plaintiff made out a prima facie case when it offered in evidence 19 bills of lading showing receipt of its cartons on board defendant's vessel in apparent good order and condition and delivery of those cartons in San Francisco in a damaged condition, and the amount of damages. *Vana Trading Co., Inc. v. S.S. Mette Skou*, 556 F.2d 100, 104 (2d Cir.), *cert. denied, sub nom. Flota Mercante Grancolombiana, S.A. v. Vana Trading Co., Inc.*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); and *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580, 588 (2d Cir. 1971); *Nissho–Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907 (2d Cir. 1980); *Madow v. S.S. Liberty Explorer*, 569 F.2d 1183, 1185 (2d Cir. 1978); Carriage of Goods by Sea Act. (COGSA). 46 U.S.C. § 1303(4). Plaintiff having made out a prima facie case, the burden of proof shifted to defendant to rebut that case by showing that the cargo damage resulted from one of the excepted causes in § 1304(2) of COGSA for which a carrier will not be held liable. *Vana Trading Co., Inc. v. S.S. Mette Skou, supra; J. Gerber & Co. v. S.S. Sabine Howaldt, supra.*

■ In attempting to rebut plaintiff's prima facie case, defendant relied upon the defense of inherent vice and the defense that there was a cause not arising out of the actual fault and privity of defendant and arising without the actual fault and neglect of the agents and servants of defendant. Section 1304(2)(p)(q).

Defendant claims that plaintiff failed to use a sufficient amount of Dowicide to pre-

---

1. Defendant contended that its surveyor was barred from the ultimate count of damaged cans versus good cans made by Voss. However, there was no proof that defendant's sur- veyor was not permitted to participate in the ultimate count or to review the results. This claim is therefore without merit.

vent mold occurring on the labels and that this fact caused the mold spores on the labels to grow. This, says defendant, constituted an inherent vice exempting defendant from liability. Defendant called Sidney Kahan as an expert witness. Mr. Kahan is a chemist with a master's degree. He testified that Dowicide was designed to prevent the development of mold under any adverse conditions provided a sufficient amount of Dowicide is used; however, he was not able to say what a sufficient amount of Dowicide would have been in this case to prevent the development of mold under the conditions which obtained here. He admitted, however, that the evidence discloses that plaintiff used twice the amount recommended by Dow Chemical Company. Mr. Kahan also testified that he performed an experiment with one of the labels using Dowicide and that no mold developed. However, this experiment proved worthless since Mr. Kahan did not know and had no information from defendants as to the actual temperature and humidity in the No. 3 and 4 holds during the voyage in question. Defendant therefore failed to prove that the mold developed because defendant did not use a sufficient amount of Dowicide in the labeling. Defendant therefore failed to prove its claim of inherent vice or latent defect not discoverable by due diligence, Section 1304(2)(p), stemming from insufficient Dowicide in the corn based paste.

■ Inherent vice has been defined by the Supreme Court as "any *existing* defects, disease, decay or the inherent nature of the commodity which would *cause* it to deteriorate with the lapse of time." *Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 136, 139, 84 S.Ct. 1142, 1143, 1145, 12 L.Ed.2d 194 (1974). The evidence disclosed, and the court has found, that mold began to develop on some of the cans prior to loading on board defendant's vessel because of the high humidity and heavy rain in Rio Grande during the long period of time that the cartons were stowed in the warehouse. All the necessary conditions for the growth of mold, including a nutrient (the corn paste), were present as described by Mr. Kahan. Defendant has, therefore, established that there was a cause for the damage to the cans for which neither defendant nor any of its agents were responsible. Having established this cause of the damage for which defendant was not responsible, the burden shifted to plaintiff to show that there was at least one other concurrent cause of the damage stemming from the fault or negligence of the defendant. *Vana Trading Co. v. S.S. Mette Skou, supra; J. Gerber & Co. v. S.S. Sabine Howaldt, supra.*

As noted above, plaintiff has proved that there was a great deal of moisture in the holds of the vessel. This was proved by the fact that cartons unloaded in Los Angeles were damp to wet on touch. It was also proved by the fact that when unloaded in San Francisco some cartons showed evidence of water damage, mold, and severe corrugation. There was also evidence of some rain on days on which loading occurred in the No. 3 hold in Recife. The court infers from the failure of defendant to produce records relating to the temperature and humidity in the holds that such records would have been unfavorable to defendant.[2] The court concludes from the evidence produced by plaintiff that defendant's negligence caused some of the cartons to become wet and to remain wet because of high humidity and poor ventilation in the holds.

■ Under COGSA defendant has a duty to properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried. Section 1303(2) COGSA. The carrier's duty also includes the duty to make the holds' refrigerated and cooling chambers and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation. Sections 1302, 1303, 1304 (COGSA).

**2.** As the Court held in *Long Island R.R. Co. v. New York Central No. 25*, 182 F.Supp. 100, 103–104 (S.D.N.Y.1960):

It is well established that when important and vital evidence is available and is not produced, the conclusion to be drawn is that such production would have disclosed facts adverse to the case of the party in custody of that evidence. (Citations omitted.)

Plaintiff having established a fault and neglect on the part of the carrier, the burden shifted to the carrier to show what part of the loss was attributable to its fault and what part of the loss was attributable to some other cause for which it was not responsible. As the Second Circuit has noted, this is practically an insuperable burden, *J. Gerber & Co., supra,* at p. 588. Defendant attempted to meet this burden by claiming that it was responsible only for 1,000 cartons which the evidence disclosed would have been needed if the cans had been repacked and re–labeled rather than sold as salvage merchandise. The court finds this insufficient proof of the portion of the damage attributable to defendant. The total of 1,000 cartons was merely an estimate of the amount of new cartons which would have been needed in case the goods were repacked and shows perhaps the number of damaged cartons, but it in no way proves the amount of mold damage caused by moisture in the holds and improper ventilation to cans in the damaged cartons as well as to cans in the undamaged cartons which the court found started in Brazil but accelerated on board ship. Defendant has also overlooked the fact that in addition to mold, some of the cans contained rust. Mr. Kahan testified that the mold could not cause rust. Defendant has also disregarded the fact that there is no proof that any of the cartons were wet or moldy on being loaded in Brazil. Finally, defendant failed to prove that plaintiff used an insufficient amount of Dowicide.

Having failed to carry its burden with respect to this portion of the case, defendant is responsible for the entire loss. *J. Gerber & Company, supra,* at 588.