**CAEMINT FOOD, INC.,**
**Plaintiff-Appellee,**

**v.**

**Lloyd BRASILEIRO, Companhia de Navegacao, Defendant-Appellant.**

**No. 828, Docket 80–9060.**

United States Court of Appeals, Second Circuit.

Argued March 12, 1981.

Decided April 28, 1981.

Rehearing and Rehearing En Banc July 22, 1981.

---

T. Barry Kingham, New York City (Curtis, Mallet-Prevost, Colt & Mosle, New York City, S. Robert Schrager, New York City, of counsel), for plaintiff-appellee.

Hollis M. Walker, Jr., New York City (Walker & Corsa, New York City, Christopher H. Mansuy, New York City and John R. Keough, of counsel), for defendant-appellant.

Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal from a judgment of the District Court for the Southern District of New York in an admiralty case, 28 U.S.C. § 1333(1), for partial damage to a cargo of canned corned beef, 501 F.Supp. 791 (1980), transported by defendant Lloyd Brasileiro for plaintiff Caemint Food from Rio Grande, Brazil, to San Francisco, California. The appeal raises questions concerning the interplay of various provisions of §§ 3 and 4 of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1303 and 1304. The district court entered judgment in favor of

plaintiff for the full amount claimed. We are constrained to reverse and to direct dismissal of the complaint.

With respect to the facts we cannot improve on the statement of the district judge, 501 F.Supp. at 792–94:

This is an action brought by plaintiff, Caemint Food, Inc., the consignee of a large shipment of canned corned beef from Brazil. Plaintiff brings this action against the defendant carrier, Lloyd Brasileiro Companhia De Navegacao, to recover for expenses and lost profits which plaintiff incurred as a result of mold and rust damage to a portion of the shipment. The total shipment, off-loaded in San Francisco, had been contained in 55,500 cartons. Each carton contained 24 or 48 cans. A total of 205,296 cans were found to contain mold on the labels and/or rust on the top and/or bottom rims. When placed in cartons the damaged cans amounted to 8,554 cartons.

The shipment had been loaded onto defendant's vessel, Lloyd Altamira, in Rio Grande Brazil between August 15 and August 18, 1977. Nineteen bills of lading had been issued to plaintiff, each of which stated that the goods had been received "in apparent good order and condition." Two certificates furnished by the Brazilian authorities also attested to the good order and condition of the shipment when loaded on board the vessel.

The shipment consigned to plaintiff had been loaded in the Nos. 3 and 4 holds of the vessel along with another shipment which was off-loaded prior to the shipment in question in Los Angeles. Between 5 and 7 percent of the cartons which had been off-loaded in Los Angeles were found to be damp to wet to the touch and to contain wet stains, although no claim for mold or rust damage was filed as to this shipment.

When the cartons were off-loaded in San Francisco on September 24, 1977, inspection revealed that some cartons had wet stains and corrugation and mold appeared on the outside of some cartons, as a result of which the shipment was denied entry, except for 10,000 cartons which passed initial inspection. The bulk of the shipment had been denied admission by the United States Department of Agriculture. An inspection conducted on behalf of plaintiffs was made by David Voss of the Bay Area Inspection Service. After the goods were denied entry, Voss initially segregated three (3) lots, or 12,000 cartons, as good for further inspection by the Department of Agriculture. These 12,000 cartons were again inspected and refused entry since individual cans were inspected and were shown to contain mold. Forty-five thousand (45,000) cartons were eventually opened at a warehouse in San Francisco and every tin examined. By this examination the 205,296 cans found to contain mold were segregated and placed into 8,554 cartons. The damaged cans came from cartons which showed evidence of having been wet as well as from cartons which appeared to be sound. Voss testified on the trial that in addition to mold on the labels he saw rust on the top and bottom rim of some cans. Thirty-six thousand nine hundred and forty-six (36,946) cartons were found to be good. These cartons, plus the 10,000 which originally passed inspection, were eventually shipped by plaintiff to Libby, the company for whom the goods had been purchased. The 8,554 bad cartons were sold as salvage.

Plaintiff incurred expenses of $67,936.17 in connection with the inspection services of Bay Area Inspection Service, the surveyor employed by plaintiff, and the sale of the damaged goods. Plaintiff's lost profit, less the amount realized in the salvage sale, was $61,059.22. Total of the damages sought by plaintiff is $128,995.39.

The cans of corned beef had been purchased by plaintiff from Swift Armour S.A. in Rio Grande, Brazil. They had been produced at two different plants owned by Swift Armour in Brazil on 31 different dates over a period of 68 days. They had been shipped to a warehouse in Rio Grande on 8 different dates—8 lots by truck, 11 lots by rail—and loaded aboard the vessel on 3 different dates.

The goods thus shipped to the warehouse remained there from June 25 until loading aboard the vessel commenced on August 15,

1977. The warehouse was brick. There is no evidence that the cartons got wet in the warehouse or en route. However, the weather report from Rio Grande showed that there had been heavy rain and very high humidity during much of the time that these cartons were stored in the warehouse awaiting loading. The evidence also discloses that part of the shipment traveled in what was described as "unstable weather."

The vessel left Rio Grande, on August 18. It stopped en route to the United States in Recife, Brazil for additional loading in the No. 4 hold. While the vessel was in port in Recife the weather report indicates that there was some light rain. The vessel log states that on August 31, 1977 at Recife the stevedores did not work because of rain. This was about three weeks before arrival in Los Angeles.

The photographs of the cartons off-loaded in San Francisco show the damaged condition of some of the cartons upon off-loading as testified to by Mr. Voss. These pictures show cartons with wet stain and corrugation. Significantly, the same pictures also reveal mold on the cartons. As noted above, inspection revealed that some of the cartons which were sound on the outside also contained from 2 to 6 moldy and rusted cans. Tests performed in San Francisco revealed that the water stains were the result of fresh water and not sea water. The 10,000 cartons which initially passed inspection were loaded on the very bottom of the No. 3 and No. 4 holds. The evidence shows that all the cartons were stowed in bulk and that a plastic covering and plywood had been placed at two tier intervals.

Charts showing the temperature and humidity indexes in the holds during the voyage, as recorded by the ship's temperature and humidity control system, were destroyed by defendant more than a year after notice of the damage and four months after formal notice of the claim.

The evidence established that the corn based paste which is used to secure the paper labels to each can of corned beef is susceptible to the development of mold which then appears on the labels. To avoid this problem a mold deterrent is used. The deterrent is manufactured by Dow Chemical Company and is known as Dowicide. The two Swift Armour Company plants in Brazil where the cans of corned beef involved here were produced, in mixing the paste for the labels, used twice the amount of Dowicide recommended by Dow in its literature. In addition, Dowicide was put on the varnish used on the cans.

Expert testimony on the trial established that mold spores are everywhere, but at least three conditions are necessary for the growth and proliferation of mold—moisture, darkness and lack of ventilation. The court finds that the shipment here was subjected to these three conditions during two separate periods of time. The first time was during the six weeks that the cartons were stored in the warehouse in Brazil when there was heavy rain and very high humidity for many days. The second time was in the holds of the vessel on the voyage from Brazil to Los Angeles, after fresh water got on the cartons during loading either at Rio Grande or Recife or both.

There is no direct proof that mold began to appear on the individual cans prior to loading. The court infers from the circumstantial evidence cited above that some mold developed during the time that the cartons were in the warehouse in Brazil.

There was no water damage to the cartons before loading as the bills of lading attest. However, some of the cartons off-loaded in Los Angeles contained wet stains and some were damp to wet on touch, circumstantial evidence from which the court infers that the cartons were either exposed to rain on loading in Rio Grande or Recife or both and that there was poor ventilation in the holds which caused the corrugation and mold on the outside of some of the cartons off-loaded in San Francisco and contributed to the proliferation of mold on the individual cans.

In awarding judgment for the plaintiff, Judge Motley reasoned as follows: Plaintiffs made out a *prima facie* case under § 1303 by offering in evidence 19 bills of

lading showing receipt of the cartons on board defendant's vessel in Rio Grande in apparent good order and condition; by demonstrating that upon delivery in San Francisco some of the cartons were wet, stained, or corrugated, that more than 200,-000 cans, both in damaged and undamaged cartons, had developed mold on the labels affixed to them, and that some cans had developed rust on their rims; and by proving the amount of the loss sustained by selling the damaged cans at salvage. The burden then shifted to defendant to bring itself within one or more of the exceptions stated in § 1304(2). Judge Motley characterized defendant's case as raising the two § 1304(2) defenses of inherent vice and of a cause arising without the actual fault and privity of the carrier and without the fault or neglect of its agents.[1] The judge stated that her finding "that mold began to develop on some of the cans prior to loading on board defendant's vessel because of the high humidity and heavy rain in Rio Grande during the long period of time that the cartons were stowed in the warehouse" brought the defendant within exception (m) and that this shifted to plaintiff the burden of showing that the fault or negligence of the defendant was a concurrent cause of the damage. 501 F.Supp. at 795. The court found that plaintiff had met this burden by producing evidence "that defendant's negligence caused some of the cartons to become wet and to remain wet because of high humidity and poor ventilation in the holds." *Id.* The situation was thus one of concurrent causes, for one of which, the "inherent defect, quality, or vice of the goods", defendant was not responsible and for the other of which it was, and the burden then shifted to defendant to show

"what part of the loss was attributable to its fault and what part of the loss was attributable to some other cause for which it was not responsible". 501 F.Supp. at 796. Noting that we had characterized this as a "practically insuperable burden", *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580, 588 (1971), the court found that defendant had not discharged it by showing that following delivery in San Francisco plaintiff had estimated that only 1000 new cartons would be needed if the cans had been repacked and relabeled rather than sold as salvage merchandise. With respect, we are unable to accept this as the proper analysis.

Plaintiff's case is necessarily based on a breach by defendant of the duties imposed by § 1303(1)(c) and (2) of COGSA:

(1) Seaworthiness

The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

$$* \quad * \quad * \quad * \quad * \quad *$$

(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

(2) Cargo

The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

In order to bring itself within these provisions, plaintiff has the burden, which remains with it throughout the case, of proving that "the goods were damaged while in the carrier's custody". *Pan-American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13

---

1. Although the judge cited § 1304(2)(p), "Latent defects not discoverable by due diligence", as the basis for the first exception, this relates to defects in the ship rather than in the cargo, see *Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co.*, 155 F.2d 687, 691 (5 Cir.), *cert. denied*, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946); *Bubble Up International, Ltd. v. Transpacific Carriers Corp.*, 458 F.Supp. 1100, 1105 (S.D.N.Y.1978); Gilmore & Black, The Law of Admiralty § 3–36, p. 167 (2d ed. 1975). The appropriate exception was instead § 1304(2)(m), which encompasses "wastage in bulk or weight or any other loss or damage resulting from inherent defect, quality, or vice of the goods", and we shall refer to exception (m) rather than (p). Under the second exception noted by the judge, § 1304(2)(q), the carrier or the ship has the burden of showing "that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

F.2d 871 (S.D.N.Y.1921) (L. Hand, J.). If plaintiff carries this burden, it establishes a *prima facie* case for recovery and will thus be entitled to prevail unless the carrier brings itself within one of the exceptions set forth in § 1304.

■ A shipper or consignee can prove that its goods were damaged while in the carrier's custody by proving "delivery of the goods to the carrier . . . in good condition, and outturn by the carrier . . . in damaged condition." *Vana Trading Co., Inc. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2 Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Madow Co. v. S.S. Liberty Exporter*, 569 F.2d 1183, 1185 (2 Cir. 1978). Since it is undisputed that the cans of corned beef for which recovery is sought were damaged when the Lloyd Altamira arrived in San Francisco, the critical question is whether plaintiff proved that the cans were in good condition when the shipment was loaded in Rio Grande.

■ A clean bill of lading is ordinarily *prima facie* evidence of delivery in good condition. See *Madow Co. v. S.S. Liberty Exporter, supra*, 569 F.2d at 1185. If plaintiff here were suing for damage to the cartons, the recitals of apparent good order and condition in the bills of lading issued by defendant would constitute *prima facie* evidence that the cartons were delivered in good condition. If defendant introduced no evidence to controvert the bills of lading, plaintiff would have carried its burden of proving delivery in good condition and, since damage to the cartons at outturn is conceded, would have established a *prima facie* case for recovery. Absent proof by defendant that the damage was attributable to one of the excepted causes enumerated in § 1304, plaintiff would have been entitled to recover for the damage to the cartons. Here, however, plaintiff seeks to recover for damage to the cans, not to the cartons.

Although a clean bill of lading normally constitutes *prima facie* evidence that cargo was in good condition at the time of shipment, courts have long recognized that it does not have this probative force where, as here, the shipper seeks to recover for damage to goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded. The leading authority to this effect is Judge Augustus N. Hand's opinion in *The Niel Maersk*, 91 F.2d 932 (2 Cir.), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937).[2] That case involved sardine meal shipped in bags; on outturn much of the meal was found to be damaged. The district court awarded judgment for the consignees on the ground that heating and sweating caused by inadequate ventilation of the ship resulted in the deterioration of the fish meal. This court reversed, holding that though the ventilation may have been inadequate, the consignees had failed to prove the good condition of the fish meal when shipped. "The recitals of 'apparent good order and condition' in the bills of lading furnished only prima facie proof of the external condition of the bags. But their external condition would not show whether the contents were potentially subject to decay or had begun to heat up or deteriorate owing to excess of moisture or other causes such as excess of oil. . . . The shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment. . . . This burden was not sustained and libelants accordingly must fail in their effort to recover damages against the

---

**2.** Although *The Niel Maersk* dealt with facts preceding the effective date of COGSA, the Hague Rules, which were the predecessor of COGSA, embodied the compromise between shipper and carrier interests which Congress had enacted in the Harter Act, 27 Stat. 445 (1893), under which *The Niel Maersk* was decided, see Gilmore & Black, The Law of Admi-

ralty, § 3–24 at 142–44 (2d ed. 1975). *The Niel Maersk* has repeatedly been cited as authoritative in cases governed by COGSA. See, e. g., *Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan*, 236 F.2d 627, 631 (2 Cir. 1956); *Elia Salzman Tobacco Co. v. S.S. Mormacwind*, 371 F.2d 537, 539 (2 Cir. 1967); *C. Itoh & Co. v.*

carrier." *Id.* at 933–34.[3] Our case is *a fortiori to The Niel Maersk* for the carrier since there was not only evidence submitted by the carrier that the cargo might have been damaged before shipment but an explicit finding by the court that some of the cans had already developed mold at that time.

■ We have repeatedly followed *The Niel Maersk* in cases governed by COGSA in holding that recitals of apparent good order and condition in a bill of lading do not inevitably satisfy the shipper's burden of showing that the damaged goods were in fact in such condition when shipped. *American Tobacco Co. v. The Katingo Hadjipatera,* 81 F.Supp. 438, 446–47 (S.D.N.Y. 1948), *modified on other grounds,* 194 F.2d 449 (2 Cir. 1951), *cert. denied,* 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952) (tobacco); *Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, supra,* 236 F.2d at 631 (bales of rubber); *American Tobacco Co. v. Goulandris,* 281 F.2d 179, 181–82 (2 Cir. 1960) (tobacco); *Commodity Service Corp. v. Hamburg-American Line,* 354 F.2d 234 (2 Cir. 1965) (fatbacks of pork). The same rule is applied in other circuits. In *Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corporation,* 316 F.2d 163 (5 Cir. 1963), Judge John R. Brown noted that "[w]here because of the perishable or intrinsic nature of the commodity, the internal condition is not adequately revealed by external appearances,

cargo may have a considerable burden of going further to prove actual condition", although the court held that cargo had discharged its burden by offering uncontroverted testimony that if the glass sheets enclosed in wooden cases there at issue had "been covered with moisture [on delivery] as they were on outturn, the external appearance of the wooden cases at time of shipment would have been similar to that revealed on discharge." *Id.* at 169–70. Here plaintiff produced no evidence that the presence of mold on the cans when the cargo was delivered to the carrier would have caused a change in the external appearance of the cartons; in fact, as we shall see, even at outturn the evidence showed no correlation between cans affected by mold and damaged cartons. Again, in *United States v. Lykes Bros. S.S. Co., Inc.,* 511 F.2d 218, 223 (5 Cir. 1975), Judge Brown stated that "a clean bill of lading merely attests to apparent good condition of cargo, based on external inspection".[4] We recently cited *Lykes Bros.* for the proposition that "[a] clean bill of lading in the case of packaged goods merely attests to apparent good condition of cargo, based on external inspection." *Vana Trading Co., Inc. v. S.S. "Mette Skou", supra,* 556 F.2d at 103 n.4. We thus approve Judge Carter's statement in *Midwest Nut and Seed Company, Inc. v. S.S. Great Republic,* 1979 A.M.C. 379, 383–84 (S.D.N.Y.1978), set out in the margin,[5] as a correct summary of the applicable law.

*Hellenic Lines, Ltd.,* 470 F.Supp. 594, 597 n.6 (S.D.N.Y.1979).

3. Judge A. N. Hand carefully distinguished, 91 F.2d at 934–35, the then recent decision in *Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934), on the ground that there the cargo "was assumed to be in good order when shipped and the damage was due to lack of ventilation, which in part was necessitated by weather which required the closing of hatches, and in part was due to the negligent failure to open hatches at times when ventilation might have been obtained by that means"—in other words a concurrence of an excepted cause in the bill of lading and the carrier's negligence—and that "[n]o question was raised as to the initial burden of the owner of the cargo to prove what was the condition of his goods at the time of shipment." Here that question has been sharply raised.

4. Although the Fifth Circuit found that the cargo was damaged prior to shipment, it reversed the district court's dismissal of the complaint and remanded for further proceedings to afford the shipper an opportunity to prove how much, if any, additional damage occurred because of the carrier's alleged failure to inspect the cargo at reasonable intervals and to take reasonable measures to minimize the shipper's loss once the damage was discovered.

5. Under the Carriage of Goods by Sea Act (COGSA) a *prima facie* case is established by proof of the delivery of the cargo to the carrier in good condition and delivery at destination in a damaged state. Generally a clean on-board bill of lading satisfies the showing of good order at the time of shipment. *Emmco Insurance Co. v. Wallenius Caribbean Line, S.A.,* 1974 A.M.C. 2052, 2057, 492 F.2d 508, 513 (5

This does not mean that a shipper or consignee that has shipped packaged goods under a clean bill of lading has no way to show the good condition of the contents at delivery in the face of a challenge by the carrier. Plaintiff may still satisfy its burden by producing credible evidence that the contents of the packages were in fact in good condition when loaded.[6] Here the plaintiff introduced certificates of good condition issued by Brazilian authorities when the cargo was loaded aboard the vessel. However, there is no indication in the certificates that the officials issuing them opened any of the cartons to inspect their contents, and plaintiff did not introduce any evidence to suggest that such an inspection was conducted. The plaintiff also offered testimony that Swift Armour inspects its cans of corned beef for mold and rust before they leave its plants, that the shipper's railroad cars are inspected for leaks, and that cartons transported by truck are covered with nylon tarpaulins.

 We need not decide whether the combination of the clean bills of lading, the certificates issued by Brazilian authorities, and the testimony concerning the handling of the goods prior to their arrival in Rio Grande constituted *prima facie* evidence of delivery in good condition. Even assuming that they did, "a prima facie case is one thing, and the burden of proof is another." *Pan-American Hide Co., supra*, 13 F.2d 871.

The shipper "has that burden on the issue whether the goods were damaged while in the carrier's custody", *id.*, and the carrier is free to controvert the evidence of delivery in good condition introduced by the shipper. See *The Ciano*, 69 F.Supp. 35, 39 (E.D.Pa. 1946); *Fidelis Fisheries v. Thorden*, 142 F.Supp. 798, 799 (S.D.N.Y.1956); *Caterpillar Overseas, S.A. v. S/S Havtroll*, 333 F.Supp. 783, 785 (S.D.N.Y.1971). The shipper must "prove by a preponderance of the credible evidence that the [goods] were delivered to the vessel in good order and condition." *Vana Trading Co., Inc. v. S.S. Mette Skou*, 415 F.Supp. 884, 887 (S.D.N.Y. 1976), *rev'd on other grounds*, 556 F.2d 100 (2 Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). It is fair to impose on the plaintiff the burden of showing the condition of packaged goods on delivery because the shipper "has superior access to information as to the condition of goods when delivered to the carrier", *Commodity Service Corp. v. Hamburg-American Line, supra*, 354 F.2d 234; *The Katingo Hadjipatera, supra*, 81 F.Supp. at 447; *Elia Salzman Tobacco Co. v. S.S. Mormacwind, supra*, 371 F.2d at 539, just as the carrier has superior access to information as to what happened thereafter.

Lloyd Brasileiro introduced evidence showing that from the time the cargo began to arrive in Rio Grande until roughly

---

Cir., 1974). Clean on-board bills of lading of packaged goods, however, merely attest to the apparent good condition of the cargo based on external inspection. See e. g., *Vana Trading Co., Inc. v. S.S. Mette Skou*, 1977 AMC 702, 556 F.2d 100 (2 Cir., 1977); *United States v. Lykes Bros. Steamship Co., Inc.*, 1975 AMC 2244, 511 F.2d 218, 223 (5 Cir., 1975); *Alcan Rubber & Chemical, Inc. v. M.V. Hellenic Leader*, 1978 AMC 63 (S.D.N.Y., 1977) (Gagliardi, J.); *E.T. Barwick Mills, Inc. v. Hellenic Lines Ltd.*, 1972 AMC 1802, 331 F.Supp. 161, 164 (S.D.Ga., 1971) [, *aff'd mem.* 472 F.2d 1406 (5 Cir. 1973)]; *F. Badrena E. Hijo., Inc. v. Steamship Rio Iguazu*, 1960 AMC 2028, 182 F.Supp. 885, 891 (E.D.La., 1960). Where cargo damage may have resulted from a hidden defect, the burden is on the shipper to establish that the cargo was delivered in good condition. *Vana Trading Co., Inc. v. S.S. Mette Skou, supra*, 1977 AMC at 705, 556 F.2d at 104; *Elia Salzman Tobacco Co. v. S.S. Mormacwind,*

1967 AMC 277, 371 F.2d 537 (2 Cir., 1967); *J. Gerber & Co. v. Holland-Amerika Lijn*, 261 F.Supp. 893, 896, 1967 AMC 1685 Sy. (E.D.La., 1966).

**6.** One method of doing this was that adopted by the plaintiff in the *Mondial case, supra*, 316 F.2d 163, namely, showing that the condition found to exist on outturn would have affected the appearance of the packages on delivery had it existed at that time. Another would be to show that the goods were prepared and packaged in accordance with proper procedures and were carried to the ship under conditions that should have prevented any damage to the contents en route. Plaintiff's difficulty arises, as we point out below, from the finding that some of the cans had developed mold before delivery and the lack of any sufficiently probative evidence that whatever caused this would not also have produced incipient mold in others.

six weeks later when it was loaded aboard the Lloyd Altamira, there were ten days of heavy rain and 26 days on which the humidity was 90% or higher. During the loading, some cartons were rejected because they were externally stained. The carrier also demonstrated that the corn based paste used to attach labels to the cans is a nutrient susceptible to the development of mold. Relying on this evidence, the district court expressly found that "some mold developed during the time that the cartons were in the warehouse in Brazil." 501 F.Supp. at 794.

Plaintiff does not challenge that finding here but argues that it nevertheless established a *prima facie* case for recovery. We cannot agree. Since at least some of the cans were damaged prior to shipment, plaintiff failed to carry its burden of proving that the cans were delivered free of the damage for which recovery is sought. Although plaintiff introduced uncontroverted evidence that the cans were damaged at outturn, it failed to prove that the cans were delivered in good condition and therefore failed to prove by a comparison of their condition at the beginning and end of the voyage that the damage occurred while they were in the carrier's custody.[7]

This, however, still does not end the matter. A shipper or consignee who has not proved delivery in good condition may nevertheless establish a *prima facie* case for recovery by producing sufficient evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody. As said in *Elia Salzman Tobacco Co. v. S.S. Mormacwind, supra,* 371 F.2d at 539:

> The shipper may also meet his burden by showing, from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo.

See, accord, *Vana Trading Co., Inc. v. S.S. "Mette Skou", supra,* 556 F.2d at 105 n.8. Plaintiff sought to bring itself within this principle by proof that many of the cartons turned out at San Francisco were wet, whereas the bills of lading negate their having been in such condition when loaded at Rio Grande, that the cargo was exposed to rain either during loading at Rio Grande or when the hatch was opened at Recife,[8] and that the only cartons which immediately passed inspection were on the bottom of the holds. There are two difficulties with this. Although it was agreed in general that dampness facilitates the development and spread of mold, plaintiff failed to establish any correlation between the damage that some of the cartons suffered and the damage to the cans. There was thus no proof of a causal relation between the wet-

---

**7.** All the cases cited by the district court to support shifting to Lloyd Brasileiro the burden of establishing an excepted cause are distinguishable because in each one it was found, in contrast to what the court found here, that the goods were in good condition when loaded. See *Vana Trading Co., Inc. v. S.S. Mette Skou,* 415 F.Supp. 884, 887 (S.D.N.Y.1976), *rev'd on other grounds,* 556 F.2d 100 (2 Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *J. Gerber & Co., supra,* 437 F.2d at 583; *Nissho-Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2 Cir. 1980); *Madow Co. v. S.S. Liberty Exporter, supra,* 569 F.2d at 1185. The additional cases cited by plaintiff likewise do not support the decision below. In *General Foods Corp. v. The Troubador,* 98 F.Supp. 207 (S.D.N.Y.1951), the court explicitly found that the damaged coffee "was in good condition when loaded", *id.* at 209. Similarly, in *C. Itoh & Co. v. Hellenic Lines, Ltd., supra,* 470 F.Supp. 594, Judge Weinfeld rejected the carrier's claim that the goods were damaged prior to loading on the basis that plaintiff had produced substantial evidence that the damage was due to wetting of the cartons and their contents during the voyage and the complete absence of any evidence that the contents were wet when packed, *id.* at 597. Finally, in the relevant portion of *American Tobacco Co. v. The Katingo Hadjipatera, supra,* 81 F.Supp. at 447, judgment went against the plaintiff on the basis of a finding that it had failed to demonstrate that the goods were in good condition when loaded.

**8.** Defendant criticizes the finding that "[t]here was ... evidence of some rain on days on which loading occurred in the No. 3 hold at Recife", 501 F.Supp. at 795, insofar as this implies that the rain could have affected the cargo and that defendant was negligent in permitting this to happen. We find it unnecessary to consider this contention.

ting of the cartons and the damage to the cans. In this respect the case differs significantly from Judge Weinfeld's decision in the *C. Itoh* case, *supra*, 470 F.Supp. 594, where the damaged boots all came from the wet stained cartons. Moreover, plaintiff submitted no evidence concerning how many of the molded cans came from the cartons that had suffered water damage as distinguished from the bulk of the cartons which were delivered in outwardly sound condition. The evidence on both these points was under the control of the plaintiff and there is no reason to excuse its failure to produce it.

The district court also predicated its decision on a finding that the formation of mold during the voyage had been promoted by improper ventilation of the ship. There was no direct evidence of this but the court drew an unfavorable inference from the fact that charts showing the temperature and humidity in the holds were destroyed more than a year after the damage and four months after formal notice of the claim, citing *Long Island R.R. Co. v. The New York Central No. 25*, 182 F.Supp. 100, 103–04 (S.D.N.Y.1960). However, the force of the inference from destruction of the records is diminished by the agreement of the parties (A 435–36) that it was the policy of Lloyd Brasileiro to destroy such records after a year and the absence of evidence that any issue as to the proper ventilation of the ship had been expressly raised before that time. It therefore seems doubtful that the routine destruction of the records, although admissible evidence, would supply sufficient proof that the vessel was improperly ventilated. See McCormick, Evidence § 273 at 662 (Cleary ed. 1972); *contra* 2 Wigmore, Evidence § 291 at 227–28 (Chad-

bourn rev. 1979). But even if there were sufficient evidence of improper ventilation, plaintiff still fails because, unlike the plaintiff in *Schnell v. The Vallescura, supra*, it did not establish that the cargo was in good condition when delivered and consequently defendant did not need to bring itself within exception (m), if indeed the carrier has the burden of bringing itself within this exception,[9] and the problem of concurrent causation was thus never reached. Some argument is also made on the basis of testimony by plaintiff's surveyor, A 218, that "[t]here was some rust on the top and bottom of the tin fold, where they folded the tin on the top and on the bottom", on the theory that the rust must have been caused by water seeping into the cartons during the voyage. Here again there was no evidence of a correlation between the presence of rust and water damage to the cartons, and the vague testimony of the surveyors would not support a damage award in any amount.

In sum plaintiff failed to bear the burden, imposed by § 1303 of COGSA, of proving that "the goods were damaged while in the carrier's custody", *Pan-American Hide Co., supra*, 13 F.2d 871. As just indicated, under such circumstances there was no need for defendant to bring itself within one of the exceptions in § 1304(2), and the question of concurrent causation does not arise.

The judgment is reversed, with instructions to dismiss the complaint.

---

**9.** Compare *Elia Salzman Tobacco Co. v. S.S. Mormacwind, supra*, 371 F.2d at 539 n.2 (declining to decide whether carrier or shipper has the burden of proof on the question whether damage was caused by an inherent vice) and *Vana Trading Co., Inc. v. S.S. "Mette Skou", supra*, 556 F.2d at 105 n.9 ("[i]t is not necessary for us to reconsider the question whether . . . the carrier has the burden of proving inherent vice . . . or the shipper has the burden of disproving that exception as a part of the requirement that it must establish the good con-

dition of the goods upon delivery"), with *The Katingo Hadjipatera, supra*, 81 F.Supp. at 446 ("whenever cargo damage could have been caused by internal defects, the shipper must disprove such defects in order to recover") and *Hecht Levis & Kahn, Inc. v. The S.S. President Buchanan, supra*, 236 F.2d at 631 (same) and *American Tobacco Co. v. Goulandris, supra*, 281 F.2d at 182 ("once the damage is shown to have been of internal origin", shipper must prove freedom from inherent vice).