**Mohammad Ali SABA, Plaintiff,**

v.

**COMPAGNIE NATIONALE AIR FRANCE, Defendant.**

**Civ. A. No. 91–3005.**

United States District Court, District of Columbia.

Sept. 20, 1994.

Michael L. Spekter, Washington, DC, for plaintiff.

Francis Montbach, Barbara Burke, Bigham, Englar, Jones & Houston, Washington, DC, for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This case involves a claim for damages allegedly caused by water to a portion of a shipment of carpets carried by defendant, Compagnie Nationale Air France (Air France), between Salzburg, Austria and Washington, D.C. Plaintiff Mohammad Ali Saba is seeking $278,950 which represents the difference between the value of the carpets undamaged and the proceeds he received for those carpets following salvage. Plaintiff also seeks pre-judgment interest, costs, and attorneys' fees.

Air France asserts that, if it is liable for any damages, that liability should be limited pursuant to the Warsaw Convention. Additionally, Air France asserts that plaintiff contributed to the damages by failing adequately to mark and protect his shipment and by not taking all available steps to ameliorate the damages.

I

Plaintiff was the owner of 800 hand-woven Persian carpets which were being stored on his behalf in Salzburg, Austria pending shipment to the United States. On September 19, 1990, he arranged with Franz Welz Internationale Transporte GmbH (Welz), a foreign air freight forwarder, to ship 575 of the carpets in 191 bales to the United States, and on the same day, Welz arranged with Air France to ship the carpets.[1] The carpets were shipped in bales, which consisted of between two and five carpets folded and stacked together, which were then wrapped in plastic and covered with burlap. Air France loaded the bales onto two metal pallets and three metal containers; it carried the carpets by air to New York; it trucked them down to Washington's Dulles Airport; and it stored them with Dynair Services, Inc. (Dynair), Air France's contract cargo handling agent, from September 25 to October 1, 1990.

Because of overcrowding in Dynair's facilities, which were small, the pallets and the containers were stored out of doors during the daytime and possibly overnight as well. During the afternoon of September 30, .34 inches of rain fell, and the following day,

---

**1.** There was much discussion, in the filings and during trial, about the fact that two different airbills were generated, one by Welz, the other by Air France, and the relationship of that fact to the liability of defendant and the standing of plaintiff to bring the suit. However, as will be shown below, none of these complications jeopardizes either plaintiff's standing or defendant's liability. As for the attempted distinction between Franz Welz Internationale Transport GmbH and Franz Welz Forwarding Agent Internationale Spedition, it plainly lacks merit.

during an inspection by the U.S. Customs Service, several individuals, including plaintiff and Dynair employees, noticed that some of the bales were wet. Plaintiff complained and then took delivery. He made a timely written complaint to Air France, and when he failed to receive satisfaction, he brought this action.

## II

This lawsuit is brought under the Convention for Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, Ts 876 (1934), *reprinted in note following* 49 U.S.C.App. § 1502 (Warsaw Convention). The Court has jurisdiction of the action, *see* 28 U.S.C. § 1330(a), 1331, and plaintiff has complied with all statutory procedures and time requirements.[2]

The Warsaw Convention applies to "all international transportation of.... goods performed by aircraft for hire," where, "according to the contract made by the parties, the place of departure and the place of destination.... are situated.... within the territories of two High Contracting Parties." Warsaw Convention, Article 1(1), (2). Article 18 provides that the "carrier shall be liable for damage sustained in the event ... of damage to ... goods, if the occurrence which caused the damage so sustained took place during the transportation by air."[3] Article

22 provides a $20.00 per kilogram limitation, which is applicable in all cases except three. Only one exception, that of carrier wilful misconduct, need concern us here and will be addressed below.[4]

A prima facie case of absolute liability under the Warsaw Convention is established upon a showing that the goods were delivered to the carrier in good condition, arrived in damaged condition, and resulted in a specified amount of damage. *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1014 (11th Cir.1987). A clean bill of lading creates a rebuttable presumption, or *prima facie* case, of delivery in good condition. *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983). With such a showing, the burden then shifts to the defendant to produce evidence controverting the bills of lading. *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir.1981). The airbills issued by Welz and Air France prior to shipment of the goods here in question all acknowledged receipt of the goods in apparent good condition. Because the defendant offered no evidence to controvert the condition of the goods received, the Court finds that they were delivered to the air carrier in good condition.[5]

It is clear that many of the carpets were damp at the time of the customs inspection at Dynair's facilities at Dulles Airport. Ste-

---

2. Defendant intimates that plaintiff lacked standing to bring this suit in the first place, on the theory that plaintiff is neither the consignor or consignee on the air waybill which was the contract between itself and Franz Welz Fwd. Agt. Internationale Spedition and Intertrans Corporation. However, defendant's reliance on *Johnson v. American Airlines, Inc.,* 834 F.2d 721, 734–35 (9th Cir.1987) in support of this contention is misplaced for that decision recognized that where, as here, the entity on the air waybill was an agent of the plaintiff, that plaintiff has standing. *See also* Georgette Miller, *Liability in International Air Transport* 274 (1977) (citing *Chicago, M., St. P. & Pac. R.R. v. Acme Fast Freight Inc.,* 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949).

3. The parties have stipulated that "[t]ransportation of the goods by air continued until [plaintiff] took delivery" of the carpets.

4. The other two exceptions occur when a shipper declares a particular value for his goods and pays the necessary increased fee, *see* Art. 22,

which Plaintiff did not do, or when the air waybill contract of carriage fails to contain certain required information as required by Article 8. *see Art. 9; Martime Insurance Company Limited v. Emery Air Freight Corporation,* 983 F.2d 437 (2d Cir.1993) (finding that only when there is a "pure omission" of a required particular does Article 9 deprive the carrier of the Article 22(2) limitation of liability).

5. If the air waybills had not made out a uncontroverted *prima facie* case that the carpets were in good condition when delivered for carriage, the Court would have then had to look to the evidence concerning the actual condition of the carpets just prior to delivery for carriage. It became clear at trial that plaintiff's method of rebaling was the industry accepted standard method of packaging Persian carpets for shipment. Any suggestion that plaintiff was negligent in how he packaged or marked the carpets was shown to be unsustainable on any theory.

phen Meirnicke, President of International Cargo Surveyors, who was hired by Air France to examine the carpets, observed that the damage included coloration changes and streaking. The pattern of this streaking was consistent with the folds of the carpets, which suggested to him that damage occurred while the carpets were in a folded position. Further, plaintiff's son, Mr. Bahram Saba, noticed during the customs inspection on October 1, 1990 that the pallet had many wet bales on it. The bales on the bottom of the unloaded pallet were the most wet, with diminishing degrees of wetness the higher the bales were stacked, and the wet carpets tended to be those that were outermost.[6]

■ Once the bales were transported to plaintiff's warehouse, 50 to 60 carpets were laid out to dry. Ultimately, while around 100 carpets out of a total of 73 wet bales were found to have been wet, only 86 of those actually suffered water damage. Some of the damage was apparent immediately, but as the carpets dried more damage was discovered. Once again, defendant offered no evidence to contradict that the carpets were delivered to plaintiff at destination in damaged condition, and plaintiff has established a *prima facie* case for the second element for liability under the Warsaw Convention.

### III

■ The proper measure of damages is the difference between the market value of the cargo in sound condition at the place of destination and the market value of the damaged goods at the place of destination at that time. *See Gulf C. & S.F. Ry. Co. v. Texas Packing Co.*, 244 U.S. 31, 37 S.Ct. 487, 61 L.Ed. 970 (1917). Plaintiff's two experts, Mr. Weschler, Vice President of the auction house of Adam A. Weschler & Sons, and Mr.

Fereidoon Vazili, both testified as to the damage. Their evidence, taken together, indicates that the damage occurred within a few hours after the carpets are exposed to water.

■ Mr. Weschler appraised the carpets' wholesale value without damage at $461,150.[7] While the same expert appraised the value of the carpets in their damaged condition at $138,850, plaintiff was able to sell the rugs for a total of $182,200. As indicated, under the measure of damages applicable to cases of damage to cargo during transportation, plaintiff's damages are the difference between the fair market value the carpets would have had in undamaged condition ($461,150) less their fair market value in damaged condition ($182,200), for an amount of $278,950.

Another means by which to establish damages would have been a damage report which Air France's regulations and Dynair's practices require their personnel to complete whenever damage is noted at cargo pick-up or when the person entitled to delivery complains about the condition of the goods. Several Air France and Dynair employees confirmed that the preparation of the report was mandatory, and that the requirements were complied with as a matter of practice. Yet while this was apparently the biggest claim ever received—the only one reaching six figures—no report was ever generated. Mr. Pesce, the station manager and manager for all mid-Atlantic claims of Air France, was responsible for submitting a copy of the report to his superiors under the air carrier's regulations. Yet he not only never asked why no report was generated, he had no explanation at trial for the nonexistence of the report. Because no such damage report has surfaced to provide a more concrete estimate of the damage suffered by plaintiff, the

---

6. Ms. Linda Nakamura, the U.S. Customs Service inspector, corroborated this conclusion, and several Dynair employees likewise indicated that the bales were wet, as did the truck driver hired by plaintiff to transport the carpets to plaintiff's warehouse.

  Even though wet bales were stacked alongside dry bales in the truck during the trip to the warehouse, Mr. Vazili, plaintiff's carpet industry expert, testified that because of the way they

were packaged, the dry bales would not have been damaged by mere contact with the wet ones.

7. While Air France did have the carpets inspected by a cargo inspector, it never had them formally appraised, and Mr. Weschler's opinion as to the wholesale value of the undamaged carpets remains uncontroverted.

Court will adopt the amount of $278,950 as the proper damage value.

## IV

The remaining issue is what liability Air France must assume. While the damage value is $278,950, the liability of the defendant could be deemed limited by Article 22 of the Warsaw Convention. This Article specifically states that absent special declaration "[i]n the transportation of checked baggage and goods, the liability of the carrier shall be limited to a sum of 250 francs (17 Special Drawing Rights) per kilogram...." This converts to $20.00 per kilogram or $9.07 per pound. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984). However, a claimant can avoid this limitation of liability for compensatory damages if he establishes that the loss was caused by the carrier's "wilful misconduct', *see* Warsaw Convention, Art. 25. The next issue to be addressed, therefore, is whether Air France is guilty of wilful misconduct.[8]

Article 25(1) of the Warsaw Convention provides:

> The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

■ This Circuit's controlling standard for wilful conduct or conduct equivalent thereto is found in *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475 (1991). The Court of Appeals in that case upheld the trial court's jury instructions to the effect that "willful misconduct is the intentional performance of an act with knowledge that the act will probably result in an injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance." *Id.* at 1479. It is also clear that a combination of factors can, taken together, amount to willful misconduct, *see Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151 (2d Cir.1978), and that merely the act itself needs to be intended, not the resulting injury or the wrongfulness of the act. *See American Airlines, Inc. v. Ulen*, 186 F.2d 529, 534 (1949); *KLM Royal Dutch Airlines v. Tuller*, 292 F.2d 775, 779–81 (1961); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1481 (1991). Finally, a finding of willful misconduct is appropriate when the act or omission constitutes a violation of a rule or regulation of the defendant carrier itself. *See Bank of Nova Scotia v. Pan American Airlines*, 16 Avi. 17, 378 (S.D.N.Y.1981).

■ The evidence provides many examples of Air France's (or its agent Dynair's) disregard of its own cargo handling regulations as well as of plain common sense. The evidence of wilful misconduct falls into two basic categories: (1) the original handling and preparing of the bales for transport, and (2) the storage of the cargo after arrival at the Dynair facility.

The evidence demonstrated that Air France failed to package the bales properly in Austria. Air France's Cargo Handling Regulations set forth rules which establish that, when possible, cargo handlers should use pallets rather than containers because they are more economical. This general rule is sharply modified by others, however, which specify that carpets are considered humidity-sensitive; that weather-sensitive considerations trump economic considerations; and above all, that recommendations become requirements when this is necessary to avoid the risk of damage to packages. *See* Plaintiff's Exh. 41 (Reg. K 41.14). It is also clear that Air France knew (or should have known) that the cargo at issue here consisted of carpets and that it was therefore humidity-sensitive. This is so if only because two of the air waybills stated that the contents were carpets and because the nature of the packaging was such to indicate that its contents

---

**8.** Another exception to the limitation of liability exists where the air waybill contract of carriage did not contain certain required information. *See* Arts. 8, 9. This second option need not concern the Court, as plaintiff no longer relies on this exception.

were carpets and thus humidity-sensitive.[9]

Further compounding its lack of judgment in selecting pallets rather than containers to house some of the carpets, Air France also failed to follow several other regulations in the preparation of those pallets. The regulations specifically state that a "double cover" of protection "must be performed" when loading humidity-sensitive cargo, such as "carpet, rugs" on pallets. Plaintiff's Exh. 41, Reg. K 41.14, p. 20. This defendant did not do. Defendant also did not provide proper reinforcement in order to prevent load instability as required, a failure that may have led to the deformation of the pallet floor in the center, which allowed the water pool to concentrate. Finally, Air France failed to follow its own regulations requiring that the tops and sides of any goods loaded onto a pallet be completely covered. *Id.* at 20.

Defendant's omissions did not end with the improper use of the pallets. Air France used containers with a net door rather than those with a rigid door, and the net doors were not closed completely or fastened properly to prevent water entry. There also was testimony which the Court finds credible that suggests that one of the doors could not close and that one of the containers had a hole in it.

Finally, and importantly, Air France stored the cargo out of doors, even during a rainfall. While it may be true that storage of cargo outside was an accepted practice at Dulles Airport due to lack of indoor storage space, it certainly has not been shown that it is an accepted practice at Dulles so to store improperly protected cargo that is known to be humidity-sensitive. And even if Air

France believed that it could store the shipment outside, it had a duty, at a minimum, to move the goods inside once the rain began to fall, if not earlier. Mr. Meirnicke, Air France's own cargo surveyor, testified that "a shipment packaged this way should not be placed in an open area with the threat of rain because it could be wet damaged."

In short, through a series of acts, the performance of which were intentional, Air France has demonstrated a reckless disregard of the consequences of its performance. This disregard is emphasized by the fact that no damage report was ever produced.[10] The Court finds that the liability limitations of the Warsaw Convention are waived.[11]

## IV

In addition to compensatory damages, plaintiff seeks attorneys' fees and costs as sanctions for the alleged bad faith of defendant because of its failure to produce or account for a damage report and because of a discovery dispute the parties had prior to trial. If an attorney "unreasonably and vexatiously" multiplies proceedings in a case, the Court may require him personally to pay excess costs, expenses, and attorneys' fees under 28 U.S.C. § 1927. However, the activities of defendant's attorney did not rise to this level, and attorneys' fees or costs will therefore not be imposed on defendants.

Plaintiff also argues for prejudgment interest.[12] The issue of whether to award such interest might be complicated if the Warsaw Convention's statutory award limitation applied in this case. However, because the award limitation has been deemed waived by the Court's finding of

---

9. Defendant's attempt to shift the blame to plaintiff for failing to note on the bales themselves that they contained carpets is unavailing. Plaintiff's carpet industry expert testified that Plaintiff's packaging of the carpets conformed to industry practice.

10. While defendant is correct in arguing that there is no causal link between the damage that occurred and the lack of a damage report, the disregard of required procedures, particularly when this damage claim was larger than had ever been made previously, reveals much about Air France's regard or lack thereof for its own procedures and its customers' requirements.

11. In view of this finding the issue as to whether the weight of the damaged rugs alone or the total weight of the bales should be used to calculate the weight component of the liability limitation equation becomes moot. Had this issue not become moot, the Court would have determined that the weight of the bales damaged would be the proper weight to use. *See Norwood v. American Airlines, Inc.,* 16 Av.Bas (CCH) 17,218 (D.C. Sup.Ct. Small Clms.1977).

12. While plaintiff initially sought pre- and post-judgment interest costs, he appears to have abandoned his claim for post-judgment costs as it was not mentioned in its post-trial filings.

defendant's wilful misconduct, it is equitable to award pre-judgment interest pursuant to 28 D.C.Code § 3302(c), and the Court will do so.

Defendant argues that plaintiff failed to mitigate damages. However, as the Court noted during the trial, this affirmative defense was not timely pled, and it therefore will not be considered, notwithstanding defendant's efforts to rephrase this defense as contributory negligence. Defendant argues, in essence, that plaintiff failed to dry the carpets fast enough and failed to seek help in treating the carpets. As the Court stated at trial, "contributory negligence is not the same as mitigation." "Contributory negligence occurs either before or at the time of the wrongful act or omission of the defendant. On the other hand, the avoidable consequences [or failure to mitigate] generally arise after the wrongful act of the defendant." *McCord v. Green*, 362 A.2d 720, 725–26 (D.C.1973). Defendant cannot avoid his failure timely to plead failure to mitigate by way of a contributory negligence claim.