**PERUGINA CHOCOLATES & CONFECTIONS, INC.,**
Plaintiff,

v.

**S/S RO RO GENOVA, her engines, boilers, tackle, etc., Costa Armatori, S.P.A., Societe Dunkerquoise d'Armement, Defendants.**

No. 83 CIV. 3987 (PKL).

United States District Court,
S.D. New York.

Dec. 9, 1986.

Harold M. Kingsley, New York City, for plaintiff; Harold M. Kingsley, Randal D. Pratt, of counsel.

DeOrchis & Partners, New York City, for defendants; Vincent M. DeOrchis, C. Daniel Negron, M.E. DeOrchis, of counsel.

OPINION

LEISURE, District Judge:

This is an action for damages arising out of the shipment of a cargo of chocolates from Italy to the United States. A non-jury trial was held on January 13 through 16, 1986. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Plaintiff, Perugina Chocolates & Confections, Inc. ("Perugina (USA)"), is a corporation with an office and place of business at 333 North Street, Teterboro, New Jersey. Perugina (USA) is engaged in the business of importing fancy chocolates for re-sale. Plaintiff is a subsidiary of IBP Industrie Buitoni Perugina S.p.A. ("Perugina (Italy)"), an Italian corporation engaged in the manufacture of chocolates and confections. Perugina (USA) owned and imported the cargo which is the subject of this action. Defendant Costa Armatori S.p.A. ("Costa Line") is an Italian corporation with an office and place of business, c/o Costa Cargo Services, Inc., 26 Broadway, New York, New York. Costa Line is engaged in the business of acting as a common carrier of goods by water for hire. Defendant Societe Dunkerquoise d'Armement ("Societe") is a French corporation with an office and place of business at 16 Boulevard Malesherbs, Paris, France. At all times material to this action, Societe owned and operated the M/V Ro Ro Genova ("Ro Ro Genova") as a merchant ship engaged in the common carriage of general cargoes. At all times material to this action, Costa Line was the charterer and operator of the Ro Ro Genova and issued the bill of lading covering the cargo in question.

The chocolates and confections which are the subject of this lawsuit were manufactured in a factory located in Perugia, Italy owned and operated by Perugina (Italy). The chocolates and confections were manufactured in a temperature controlled environment at 18° C (64° F). After manufacture, the chocolates and confections were kept in a refrigerated warehouse at a constant temperature of 10° C (50° F).

During the summer months, Perugina (Italy) ordinarily ships chocolates and confections to the United States in refrigerated containers. The fact that Costa Line's vessels were not equipped to handle refrigerated containers was known by Perugina's freight forwarders in Italy. Perugina (Italy) was aware of the absence of refrigerated service by Costa Line since they did not use Costa Line during the summer months, instead turning to other carriers who did provide refrigerated service. According to Estevan Giannoni, Perugina's Production Manager, Perugina (Italy) used refrigerated containers until the end of August; beginning with the end of August or early September, normal containers are used. According to Dr. Claudio Trappoloni, the Perugina (Italy) quality controller, the decision to switch to non-refrigerated containers was made based upon local weather conditions and forecasts of conditions in the North Atlantic.

The ocean freight charge for refrigerated containers was twice that for non-refrigerated containers. Defendant's freight rate for the transport of the containerized cargo in suit was governed by the "West Coast of Italy, Sicilian and Adriatic Ports North Atlantic Range Conference" or "WINAC" tariff. Under this tariff, conference carriers charge $40.00 per ton for the carriage of non-refrigerated containers and $85.00 per ton for refrigerated containers. In this case, the freight charge for the 528 tons of chocolates amounted to $21,120 on a non-refrigerated basis. On a refrigerated basis, the ocean freight would have cost over $44,000.

On or about September 13, 1982, Perugina (Italy) caused certain of its chocolate and confectionary products to be loaded into eight forty-foot containers. The eight containers, numbered as follows, were described by the freight forwarder to the carrier, as containing the following items:

INBU 132676/8—chocolate cartons and caramel candies

CTIU 415503/7—caramel candies

XTRU 888788/2—hard candies

CTIU 454743/9—hard candies

UFCU 215398/5—chocolate cartons

INTU 429374/9—chocolate cartons

FVIU 139452—chocolate cartons

SSIU 216192/3—caramel candies

The goods were counted and loaded into each of the containers by employees of Perugina (Italy), the shipper, in Perugia, Italy, who thereafter locked the doors to

the containers and applied seals to each of the container doors. From this point forward the shipment traveled "house-to-house," which means that once the seals were placed on the containers by Perugina (Italy), they were not to be opened until they arrived at their final destination. None of the containers were refrigerated, insulated or ventilated. Before loading, Perugina (Italy) had the containers parked in the shade in an attempt to protect them from the heat as much as as possible under the circumstances.

The trucking documents indicate that the containers arrived at the Perugina (Italy) plant and departed at the following times the next date.

| Number | Arrival Time | Departure Time |
|---|---|---|
| INBU 132676/8 | [no time indicated] | |
| CTIU 415503/7 | [no time indicated] | |
| XTRU 888788/2 | 9:20 a.m. | 2:45 p.m. |
| CTIU 454743/9 | [no time indicated] | |
| UFCU 215398/5 | 8:15 a.m. | 2:45 p.m. |
| INTU 429374/9 | 7:50 a.m. | [no time indicated] |
| FVIU 139452 | 9:10 a.m. | 5:20 p.m. |
| SSIU 216192/3 | 10:25 a.m. | 5:10 p.m. |

The first four containers arrived on September 13, 1982; the next four arrived on September 14, 1982.

Thereafter, the containers were trucked from Perugia to Livorno, Italy, by Perugina (Italy)'s freight forwarder, Osvaldo Bonignori di Alfeo Bonsignori S.n.c. ("Bonsignori"). Bonsignori instructed the truckers that, when they delivered the containers to the terminal of the stevedoring company, Sintermar, the containers should be unloaded in a shaded area or on the ground with other containers on top so that they would not be exposed to direct sunlight. Dock receipts prepared by the shipper (bouno d'imbarco) contained special stowage instructions in Italian: "Stivare Lontano Da Fonti Di Calore" (store away from heat sources). In the custom and usage of the port of Livorno, this recommendation means that the stevedore or the steamship company should store chocolate loaded containers under other containers so as to avoid direct sunlight. In addition, it means that if such containers are stowed beneath decks, they should be kept away from the

engines and under the water lines. While the buono d'imbarco contained the warning to stow away from heat sources and a description of the contents of each container, the bill of lading did not provide such information.

The trip from the Perugia factory to Livorno is approximately 260 kilometers or 162 miles and takes four to five hours by truck. The following containers were received at the pier by Sintermar on September 14, 1982 at the following times:

| | |
|---|---|
| INBU 132676/8 | 09:00 a.m. |
| CTIU 415503/7 | 10:20 a.m. |
| XTRU 888788/2 | 08:45 a.m. |
| CTIU 454743/9 | 09:10 a.m. |

The following containers were received at the pier by Sintermar on September 15, 1982 at the following times:

| | |
|---|---|
| UFCU 215398/5 | 12:20 p.m. |
| INTU 429374/9 | 10:35 a.m. |
| FVIU 139452 | 10:20 a.m. |
| SSIU 216192/3 | 12:15 a.m. |

Temperatures in the region of Perugia, Italy reached a high of 28.1° C (82.6° F) on September 13, 1982, and 27.2° C (80.9° F) on September 14, 1982. In Leghorn (Pisa Weather Station), temperatures reached 31.4° C (88.5° F) on September 14, 1982 and 30.3° C (86.5° F) on September 15, 1982.

The containers were loaded on board the Ro Ro Genova on September 16, 1982, the same day the vessel sailed. The Ro Ro Genova was built in 1980 and was designed to carry three types of cargo at the same time: containers, "ro-ro" or roll-on roll-off cargo, and break-bulk or ordinary cargo. This ship was designed to carry twenty and forty foot containers on decks which are loaded aboard with shore cranes. Ro-ro cargo, which has its own means of propulsion by tractors or cars, are brought up a ramp and placed in the ship's 'tween deck. Crates, boxes and other break-bulk cargo are stowed in the vessel's hatch. In order for containers to be carried under the deck, the containers would have to be placed on a chassis or malfi with wheels to be rolled onto the ship.

According to Captain Fabrizio Zerbini, the Costa Line port captain responsible for

the stowage on the Ro Ro Genova, this can be done only at the specific request of the shipper and entails very difficult maneuvering in order to drive and position a forty foot container onto the ship. Bonsignori, Perugina's freight forwarder, never requested Costa Line to carry the containers on a ro-ro basis. Bonsignori did not instruct Costa Line to stow the containers under deck and was aware that container ships are designed to carry containers on deck as well as under deck.

The eight containers were stowed on the vessel's weather deck in the following manner. Container XTRU 888788/2 was placed forward on an upper tier next to container CTIU 454743/9, which was on the starboard side. This left the top and rear panels of these containers exposed. Container CTIU 415503/7 was stowed aft on the second tier, which at that location is the top tier. Its top, front and rear ends were exposed. Container INBU 132676/8 was placed aft on the second tier, which at that location was the top tier. Container SSIU 216192/3 was stowed aft on the first tier, with containers placed above it and alongside of it. Its front and back ends were exposed. Container UFCU 215398/5 was stowed forward on the first tier, covered and surrounded by other containers, except at the aft end. Container INTU 429374/9 was stowed forward on the second tier covered by other containers. Its port side was exposed. Container FVIU 139452 was stowed amidships on the second tier, covered by other containers, with one side exposed.

The cargo was carried aboard the Ro Ro Genova from Leghorn to New York under bill of lading 930, dated September 16, 1982, issued by defendant Costa Line. The vessel arrived at the Port of New York on September 29, 1982. The eight containers were delivered to the trucker on September 30, 1982, and October 1, 1982. According to the ship's log, during nine of the twelve days of the voyage, the sky was cloudy or overcast. Temperatures ranged from a low of 20° C (68° F) to a high of 32° C (90° F) on September 25, 1982. The average daytime ambient temperatures experienced by the vessel during the voyage was 78.5° F.

On or about October 1, 1982, the containers were delivered, pursuant to plaintiff's arrangements, to the Teterboro, New Jersey premises of Perugina (USA), the consignee. Perugina (USA) maintains warehouse facilities for the storage of chocolates and confections in Little Ferry, New Jersey, and in Teterboro, New Jersey, where the temperature is maintained between 55° F and 60° F.

On October 1, 1982, the shipment was surveyed by Donald M. Lamont on behalf of plaintiff. The cargo was removed from the containers and examined by Mr. Lamont, along with Joseph Deutsch, President of Perugina (USA), and Ronald Vrana, the company's controller. The damaged items were segregated. Mr. Lamont concluded that the condition of the damaged candies indicated that the cause of the melting damage was excessive heat. A food expert retained by plaintiff, Vibert Mayers, segregated the damaged cargo from the sound cargo. He observed that candies that superficially appeared intact were in fact dried out on the inside. He attributed this condition to heat exposure. Mr. Lamont conducted a final count of the number of damaged cartons and concluded that 2001 cartons were damaged due to melting. The 2001 cartons consisted of 663 cartons from container number XTRU 888788/2, 371 cartons from container number CTIU 454743/9, 244 cartons from container number UFCU 215398/5 and 723 cartons from container number INBU 132676/8.

On October 2, 1982, the shipment was surveyed by Joseph H. Ledbetter of Peter F. Luard Co., Inc., on behalf of defendant. Mr. Ledbetter testified that, when he first arrived at the Perugina plant, he spoke to Mr. Vrana who told him that there was heat related damage to a certain number of cartons. Mr. Vrana reported to Ledbetter that most of the cartons around the upper tiers of the containers, as well as the sides and perimeter of the stowage, had been

affected by heat. Boxes in the core or middle of the container that were not touching or adjacent to any of the external surfaces were in good order and condition. Mr. Ledbetter asked Mr. Vrana why, in view of the summer like conditions, the shipment was not made by means of refrigerated containers. Mr. Vrana replied that Perugina had been premature in switching from refrigerated units to non-refrigerated units. He advised Mr. Ledbetter that during the summer months all shipments were normally carried in refrigerated containers, but that there was a cut-off date of approximately September 15.

Mr. Ledbetter's inspection of the segregated cargo led him to observe that the chocolate was discolored, that is, it had "whitened." He also noted that some melting had occurred to the extent that the pieces of chocolate appeared misshapen. He did not observe any candy that indicated that the piece of chocolate had in fact turned into a pool of liquid. In some cases the candies were stuck to the trays or the foil wrapping.

Mr. Ledbetter testified that Mr. Vrana told him that there were three types of damaged cargo. The first was "bloom" damage, where the heat had caused the butter fat to migrate to the surface and make the candy sweat. The second category included pieces of chocolate that melted due to high temperature. This included candies that were stuck to the packaging, cookies that had the chocolate covering melt off and Baci candy with dried insides that crumbled relatively easily. The third category included cookies that were slightly stuck together, and possibly some bloom damaged Baci pieces. Based on his observations, Mr. Ledbetter concluded that the damage occurred as the result of the product being subjected to warm temperatures sometime during the course of transportation from the point of origin at the Perugina (Italy) factory to the ultimate destination, the Perugina (USA) factory.

The shipments contained chocolates of various kinds, including milk and dark chocolates. Dr. Trappoloni testified that cocoa butter, a common ingredient in these chocolates, begins to soften when heated to 25° C (80° F). Full melting occurs between 30° C (83° F) and 35° C (88° F). Butter fat, another ingredient, has a much lower melting point. Dark chocolate melts at 27° C (80° F). Milk chocolate melts at temperatures between 24° and 25° C (77°–78° F). Baci chocolate, which is largely a dark chocolate product, begins to melt at 25° C (80° F). Chocolates will exude butter fat, or start to glaze or whiten at a temperature of 26° C (79° F). Caramel candies, on the other hand, melt when heated to 240°–265° F. Blooming or whitening of chocolate happens more readily when temperature fluctuations occur rapidly. Such temperature fluctuations occur, for instance, when night changes to day and day to night. According to Dr. Trappoloni, chocolates do melt when the ambient air temperature is high enough, but temperatures below 25.6° C (77° F) do not require any shipping precautions.

The internal temperatures of Cargo containers exposed to the sun rise significantly above the ambient air temperature. David M. Moutner, plaintiff's expert witness on the handling and shipping of temperature sensitive cargoes, testified that after exposure to the sun, the temperature inside a container would rise anywhere from 30°–40° F above the ambient temperature, and that this increase occurs very quickly, within one hour. Average daytime ambient tempertures experienced by the Ro Ro Genova during her voyage were approximately 78.5° F. Thus the internal temperatures of the containers would rise to 108° F to 118° F according to Mr. Moutner's theory. Fred Jacobson, defendant's expert on chocolates and confections, testified that if the temperatures inside of the containers had reached such levels, the chocolates would have melted and seeped through the boxes and the actual pieces would have been "flat out in those packages. They would have been totally melted."

After the operation of segregating the damaged cargo from the undamaged cargo was completed, the product that was

deemed unsalable was destroyed. Plaintiff determined that the cargo was unsalable according to its specifications. The Baci product, a high-priced candy, has a unique shape. In 1982, Perugina (USA) spent over $500,000 in advertising its products, including the Baci candy. The fact that each piece was wrapped with the Perugina name on it made it risky to sell it to a salavager who would turn around and market the candy on a discount basis.

Perugina (USA) received salvage bids on the cargo. Expert Sales and Salvage Company bid $25,000 on an as is where is basis, and did not offer a bid for the candy with packaging or wrappers removed. Commodities Assistance Corporation bid $33,-500 on an as is where is basis, and $10,000 for the cargo with all the packaging removed. According to the terms of these bids, the responsibility for removing the packaging and wrapping was plaintiff's. It would have been costly for Perugina (USA) to remove the packaging. Perugina (USA) spends a significant amount of money to promote its products. If Perugina (USA) had permitted discount sales of damaged candy, there would have been a risk of hurting its image.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this Admiralty case pursuant to 28 U.S.C. § 1333(1). This Court also has jurisdiction over the person of the corporate defendants and the vessel *in rem.*

2. This case arises under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–15 (1936), which applies of its own force, and by incorporation into the ocean carrier's bill of lading.

■ 3. In any COGSA action, the "plaintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351 (2d Cir.1981) (Friendly, J.) (*quoting Pan-American Hide Co. v. Nippon Yusen (Kabushiki) Kaisha,*

13 F.2d 871, 871 (S.D.N.Y.1921) (L. Hand, J.)).

■ 4. Bills of lading are only *prima facie* evidence of the apparent good order and external condition of the goods received. *The Niel Maersk,* 91 F.2d 932, 933 (2d Cir.) (A. Hand, J.), *cert. denied,* 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937); *Indiana Farm Bureau Cooperative Assoc. v. S.S. Sovereign Faylenne,* 1978 A.M.C. 1514, 1526 (S.D.N.Y.1977). Therefore, "recitals of apparent good order and condition in a bill of lading do not inevitably satisfy the shipper's burden of showing that the damaged goods were in fact in such condition when shipped." *Caemint Food,* 647 F.2d at 353.

5. "Where because of the perishable or intrinsic nature of the commodity, the internal condition is not adequately revealed by external appearances, cargo may have a considerable burden of going further to prove actual condition." *Caemint Food,* 647 F.2d at 353 (*quoting Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.,* 316 F.2d 163, 170 (5th Cir.1963)); *J. Howard Smith, Inc. v. S.S. Maranon,* 501 F.2d 1275, 1278 (2d Cir.1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975); *Midwest Nut and Seed Co. v. S.S. Great Republic,* 1979 A.M.C. 379, 384 (S.D.N.Y.1978).

6. "It is fair to impose on the plaintiff the burden of showing the condition of packaged goods on delivery because the shipper 'has superior access to information as to the condition of goods when delivered to the carrier.'" *Caemint Food,* 647 F.2d at 354 (*quoting Commodity Service Corp. v. Hamburg-American Line,* 354 F.2d 234, 234 (2d Cir.1965)).

7. The shipper has the ultimate burden of proof on the issue whether the goods were damaged while in the carrier's custody and the carrier is free to controvert the evidence of delivery in good condition introduced by the shipper. *Caemint Food,* 647 F.2d at 354.

8. "The shipper must 'prove by a preponderance of the credible evidence that

the [goods] were delivered to the vessel in good order and condition.'" *Caemint Food,* 647 F.2d at 354 (*quoting Vana Trading Co. v. S.S. Mette Skou,* 415 F.Supp. 884, 887 (S.D.N.Y.1976), *rev'd on other grounds,* 556 F.2d 100 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

9. "The burden of proof lies with the plaintiff to show that the goods were in fit internal order and condition *to survive the voyage for which they were booked.*" *Commodity Service Corp. v. Boston Insurance Co. & Hamburg-American Line,* 1964 A.M.C. 926, 939 (S.D.N.Y.1964), *aff'd,* 354 F.2d 234 (2d Cir.1965) (emphasis added). *Cf. The Niel Maersk,* 91 F.2d at 933 (Plaintiff must show that the goods were delivered to the carrier "in a condition fit for transportation.").

■ 10. In this case plaintiff has not proved delivery to the carrier in good condition by a preponderance of the evidence. Since Perugina (Italy) placed the chocolates in containers that were locked and sealed before delivery to the defendant, there was no direct evidence of their actual condition upon delivery. Moreover, plaintiff has not carried its burden by circumstantial evidence. During the trip from the chocolate factory to the terminal of the stevedoring company, the containers of chocolates were exposed to temperatures—and fluctuations of temperature—capable of damaging the goods.

11. A shipper "who has not proved delivery in good condition may nevertheless establish a *prima facie* case for recovery by producing sufficient evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody." *Caemint Food,* 647 F.2d at 355. The shipper may meet this burden "by showing, from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo." *Id.* (*quoting Elia Salzman Tobacco Co. v. S.S. Mormacwind,* 371 F.2d 537, 539 (2d Cir.1967)).

12. A shipper "establishes a prima facie case under COGSA if it shows that the cargo was delivered in good condition to the carrier but was in damaged condition when discharged." *Goya Foods, Inc. v. S.S. Italica,* 561 F.Supp. 1077, 1082 (S.D.N.Y.), *aff'd,* 742 F.2d 1434 (2d Cir.1983); *Associated Metals & Minerals Corp. v. M/V Rupert de Larrinaga,* 581 F.2d 100, 101 (5th Cir.1978).

13. If it appears as likely as not that the damage complained of occurred before delivery to the defendant, the shipper does not prove delivery in in good condition and does not establish a prima facie case under COGSA. *Cf. Goya Foods,* 561 F.Supp. at 1083, 1085 (Even though it is "quite possible that the pimientos froze while on board ship," the Court is "unable to say that the pimientos *more likely* froze on board ship than on the pier," and therefore plaintiff has not proven discharge in a damaged condition and has not established a prima facie case under COGSA.).

14. In this case, the nature of the damage suffered indicates that the cause was exposure of the containers to excessive ambient air temperatures, not prolonged exposure to direct sunlight. The Court is therefore unable to say that the damage is more likely to have occurred on board ship than prior to delivery to the defendants. *See The Niel Maersk,* 91 F.2d at 934 ("[T]here may have been some damage due to bad stowage but how much we cannot say, nor indeed can we say with any certainty whether all of the damage was not due to the original 'nature of the goods' when loaded.").

■ 15. If the plaintiff does not establish that the cargo was in good condition when delivered, then even if there is evidence of improper stowage, defendant does not need to bring itself within the exception for "inherent vice," 46 U.S.C. § 1304(2)(m), and the problem of concurrent causation is never reached. *Caemint Food,* 647 F.2d at 356; *American Tobacco Co. v. Goulandris,* 281 F.2d 179, 181–82 (2d Cir.1960); *American Tobacco Co. v. The Katingo Hadjipatera,* 81 F.Supp. 438, 446–47 (S.D.N.Y.1948), *modified on other grounds,* 194 F.2d 449 (2d Cir.1951), *cert. denied,* 343

U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). *Compare Schnell v. The Vallescura,* 293 U.S. 296, 305–06, 55 S.Ct. 194, 196–97, 79 L.Ed. 373 (1934) (Plaintiff established that cargo was received by defendant in good condition and consequently the problem of causation was reached.) *as explained in The Niel Maersk,* 91 F.2d at 934.

16. "The condition of the goods when placed on board was not within [the carrier's] knowledge, and it should not have the burden of separating damages arising from causes prior to shipment from damages due to negligent stowage." *Indiana Farm Bureau Cooperative Assoc.,* 1978 A.M.C. at 1529 (*quoting The Niel Maersk,* 91 F.2d at 934–35).

17. "In sum plaintiff failed to bear the burden, imposed by § 1303 of COGSA, of proving that 'the goods were damaged while in the carrier's custody,' " *Caemint Food,* 647 F.2d at 356 (*quoting Pan-American Hide Co.,* 13 F.2d at 871). Plaintiff has also failed to sustain "the initial burden of proving the condition of the shipments when made so that [it has] not established a cause of action." *The Niel Maersk,* 91 F.2d at 935.

18. Therefore, defendants are not liable to plaintiff.

SO ORDERED.