**A.J. CUNNINGHAM PACKING CORP., Plaintiff,**

v.

**M/V AUSTRALIAN EXPORTER, her engines, tackle, apparel, etc., in rem.**

v.

**ASSOCIATED CONTAINER TRANSPORTATION (AUSTRALIA) LTD., Blueport A.C.T. (NZ) Ltd., and Australian Shipping Commission (Australian National Line), in personam, Defendants.**

**No. 86 Civ. 5433 (KTD).**

United States District Court, S.D. New York.

Sept. 11, 1989.

Kennedy & Lillis (John T. Lillis, Jr., Charles E. Schmidt, of counsel), New York City, for plaintiff.

Walker & Corsa (Christopher H. Mansuy, of counsel), New York City, for defendants.

KEVIN THOMAS DUFFY, District Judge.

Plaintiff A.J. Cunningham Packing Corp. ("Cunningham") brings this action against the M/V Australian Exporter, Associated Container Transportation (Australia) Ltd., Blueport A.C.T. (NZ) Ltd., and Australian Shipping Commission (Australian National Line) (jointly referred to as "Ocean Carriers") under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–1315 (1982 & Supp. V 1987). Cunningham seeks to recover for damage to cartons of beef shipped from New Zealand to the United States.

A bench trial was held on October 3 and 12, 1988. After considering all of the evidence and admissible exhibits presented, the following constitutes my findings of fact and conclusions of law.

## FACTS

This case involves damage to 636 cartons of frozen beef. Chronologically, the proof regarding the travels of the beef indicates the beef was slaughtered at W. Richmond Ltd. or Pacific Freezing Company (jointly "Pacific Freezing") in the spring of 1985. It was packaged first into plastic bags and then into cardboard cartons. The cartons were next sent to Hawke's Bay Export Cold Storage Facility in Napier, New Zealand ("Hawke's Bay"). Inconsistent packing dates stamped on the cartons indicate the possibility that some older beef cartons were improperly included in the load.

The cartons were received and stored in two separate freezers at Hawke's Bay. The temperature of the freezers was constantly monitored, electronically recorded, and checked by a representative of the New Zealand Ministry of Agriculture and Fisheries ("NZMAF"). The temperature monitor showed that the temperature in one freezer was kept at minus fifteen degrees Celsius and the other at minus 20 degrees Celsius. No fluctuation was recorded sufficient to allow the meat to defrost. Neither were there any apparent problems with the freezer during the period that the 636 cartons were stored at Hawke's Bay.

At the direction of Pacific Freezing, Hawke's Bay employees stuffed the 636 cartons into an insulated container on July 11, 1985. The container was sealed by a representative of NZMAF. Although the authorization for export to the United States was signed by NZMAF Inspector Michael James Hansen, Hansen testified that he may not have sealed the container personally and therefore may not have observed the cartons. He certainly did not inspect the meat itself. The Hawke's Bay foreman who was responsible for the stuffing of the container did not testify in the course of this trial. The Hawke's Bay business records do not indicate that any problem with the cartons was visible at the time they were stuffed in the container.

Express terms in the bill of lading for the container allocate to the shipper the responsibility for stuffing the container. The Ocean Carrier is then responsible for stripping the container and delivering the contents to Wilmington, Delaware. The bill of lading also provides, as required by COGSA, that the goods are in apparent good order and condition. Joint Trial Exh. 6.

Ocean Carriers moved the stuffed container from Hawke's Bay to Wellington, New Zealand on July 11–13, 1985. During this trip there was no external source of mechanical refrigeration attached to the container. No testimony indicated that the lack of refrigeration for this period could be sufficient to allow the meat to defrost.

An external clip-on refrigeration unit ("CRU") was attached to the container on July 13. The CRU, set to maintain the container temperature at minus 20 degrees Celsius, remained attached until the container was delivered to the Holt Terminal pier in Gloucester, New Jersey on August 5, 1985. A Partlow chart recorded the temperature of the container while the CRU was in operation. Although the evidence indicates a possibility that the Partlow recording device was not properly maintained during the shipment, no evidence indicates that the CRU itself malfunctioned.

The container remained in Holt Terminal from August 5–7, 1985 without the CRU. The Holt Terminal records indicate that a freezing flow of liquid nitrogen was "blasted" or "dump-charged" into the container on August 7. Later that same day, the container was moved to Wilmington Stevedores facility in Wilmington, Delaware for stripping. The 636 cartons of meat were stripped from the container on the morning of August 8 and the container was returned to Holt Terminal. The cartons were then sent to the First State Freezer facility in Newark, Delaware. Inspection of the returned container did not reveal any evidence of problems, such as might be

present if the meat had defrosted, with the cartons or the meat itself.

After arrival at the First State Freezer facility, a United States Department of Agriculture ("USDA") inspector examined random cartons from throughout the load. That inspector refused entry to the entire shipment because of "Off Condition Beef —7 critical defects. Code 03." Plaintiff's Trial Exh. 9. The random cartons examined by the inspector were then segregated and locked into a fenced area within the freezer. No appeal or request for clarification was taken to the USDA. Neither was definitive evidence provided regarding the precise meaning of the USDA's reason for refusal.

After the USDA rejected the cartons, an insurance surveyor, Robert Majewski, examined the segregated cartons from outside the wire fence. Majewski's contemporaneous notes indicate that those cartons had deteriorated, were bloodstained, showed signs of wetness at some prior time, and emitted a sour smell. *See* Defendants' Trial Exhs. L and FF. Majewski also looked at the cartons that were not stored in the USDA's fenced area. He did not notice any such problems with those cartons.

In substance, the proof establishes little more than that several of 636 cartons of beef shipped from New Zealand to the United States were in a condition that caused the USDA to reject the entire shipment. The documents recording each stage of the transportation process, many of them completed by individuals who did not personally inspect the meat or even view the cartons, do not establish that the 636 cartons were defrosted at any time during the voyage. Neither is there any evidence, other than negative inference, to indicate that the meat was in good condition prior to the voyage.

## DISCUSSION

COGSA imposes on Cunningham the burden of proving "that the cargo was delivered to the carrier in good condition and . . . left the carrier's custody in damaged condition." *English Elec. Valve Co., Ltd.*

*v. M/V Hoegh Mallard,* 814 F.2d 84, 87 (2d Cir.1987) (citations omitted). That burden remains with Cunningham throughout the case. *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351 (2d Cir.1981).

■ The bill of lading may be prima facie evidence that the cargo was delivered to the carrier in good condition. However, when the goods are packaged prior to delivery to the carrier, or where the damage is not apparent on visible inspection of the goods, the bill of lading representation is not sufficient. *Caemint Food,* 647 F.2d at 352–53. *See also* 46 U.S.C.App. § 1303(3)(c).

Here, an agent of the shipper rather than Ocean Carriers was responsible for the stuffing and sealing of the container. Ocean Carriers received the sealed container and issued the clean bill of lading at least in part in reliance on NZMAF approval of the cargo. Yet, the NZMAF official that approved the container was not sure if he was present when the cartons were placed in the container and may never have personally seen the cartons. Finally, the nature of the damages alleged here could well have been hidden at the time of delivery to Ocean Carriers. Thus, mere proffer of a "clean" bill of lading is insufficient to satisfy Cunningham's burden of proof under COGSA.

■ Cunningham, however, could have met its burden of proof by demonstrating that it delivered the cargo in good order and condition, *id.* at 354, or "that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody." *Id.* at 355. I find that it has shown neither.

Cunningham is presumed to have superior access to evidence regarding the history of the beef prior to its delivery to the Ocean Carriers. *Id.* at 354. Yet, the gaps in its proof leave open the possibility that the beef was damaged at some time before it was delivered to Ocean Carriers. For example, although NZMAF documents demonstrate that transport of the cartons from Pacific Freezing to Hawke's Bay was approved, there is no evidence regarding

the condition or treatment of the cartons or the meat they contained prior to the time that they were stored at Hawke's Bay. In addition, no testimony was offered from any individual who observed or participated in the stuffing of the container. The fact that nothing in Hawke's Bay's records indicates that problems were observed during the stuffing is not sufficient proof that no problems existed. It is particularly unpersuasive in light of evidence that some of the cartons sent to Hawke's Bay may not have been properly included in the load.

Thus, I find that the evidence does not demonstrate that the complained of damage, apparently caused by defrosting of at least some of the cartons at some point in their history, is more likely to have occurred after delivery to Ocean Carriers than before. *See Perugina Chocolates v. S/S Ro Ro Genova*, 649 F.Supp. 1235, 1241 (S.D.N.Y.1986). Indeed, the scant affirmative evidence presented regarding care of the beef prior to its delivery to Hawke's Bay indicates the possibility of error in the packaging and the improper inclusion of older cartons of beef with that shipment.

In sum, Cunningham has failed to meet the prima facie burden of proof imposed by § 1303 of COGSA. There is therefore no need to examine Ocean Carriers' defenses. *See Caemint Foods*, 647 F.2d at 356. The complaint is dismissed in its entirety.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Submit Judgment on notice within ten days of the date hereof.