**RIT–CHEM CO., INC., Plaintiff,**

v.

**S/S VALIANT, her engines, boilers, etc., Spitha Maritime, S.A. and Pharos Lines, S.A., Defendants.**

No. 88 Civ. 4791 (BN).

United States District Court, S.D. New York.

July 31, 1990.

Kennedy & Lillis, New York City (John P. Conroy, of counsel), for plaintiff.

Mahoney & Keane, New York City (Edward A. Keane, of counsel), for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the Court of International Trade, sitting by designation:

### INTRODUCTION

Plaintiff Rit–Chem Co., Inc. ("Rit–Chem"), the consignee of a containerized shipment of anhydrous citric acid from Turkey, brings this action against defendant Pharos Lines, S.A., ("Pharos") pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300 *et seq.*, seeking recovery of $27,803.86 plus interest, representing the value of damaged cargo. Plaintiff has voluntarily discontinued the action with respect to the other named defendants.

The court has maritime jurisdiction of this matter pursuant to 28 U.S.C. § 1333 (1982). The following constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

Plaintiff, a corporation with an office and place of business at 109 Wheeler Avenue, Pleasantville, New York, is engaged in the business of importing and distributing chemicals. Defendant, a foreign corporation having an office and place of business c/o Constellation Navigation, Inc., 233 Broadway, New York, New York, chartered the S.S. Valiant ("the vessel") for, *inter alia,* transport of plaintiff's goods.

Pharos provided the shipper, Fepas Dis Ticaret A.S. ("Fepas"), with Container No. TCLU 920167/9, an empty 40 foot long steel container. Fepas containerized the shipment at an undisclosed location some time prior to loading it aboard the vessel on March 29, 1988 at the Port of Istanbul, Turkey (Tr. 77).[1]

---

1. References to the trial transcript are referred to as (Tr. *x* ).

According to the bill of lading, the container was loaded with 480 bags of anhydrous citric acid and sealed for shipment house-to-house destined for the Port of New York (plft's exh. 3).[2] The goods were packed into 50 kilogram 5-ply bags and stowed 10 bags per wooden pallet (see plft's exh. 12 surveyor's report). Of the 48 pallets loaded into the container by the shipper, the contents of five pallets, i.e., 50 bags, were loaded in loose condition. The invoice from Fepas indicated a C.I.F. value of $37,032.[3]

Pharos issued the bill of lading indicating it had received the goods from the shipper in "apparent good order and condition" (plft's exh. 3). Importantly, the bill of lading bore the notation "shipper load count and stow," signifying that the shipper had responsibility for loading and sealing the container, and as a result, the carrier could not verify the contents of the container.[4]

The vessel's stowage plan reveals the container was stowed below the deck in bay No. 4 (deft's exh. M; Tr. 475). There is no evidence that the container doors were ever opened or that the container was exposed to sea water at any time during the voyage. The vessel arrived at the discharge port, Maher Terminals, Port Elizabeth, New Jersey on April 21, 1988 (Tr. 511).

On April 25, 1988 the container was transported from Maher Terminals to plaintiff's warehousing agent, Bex Inc. ("Bex"), in Clifton, New Jersey. The record does not reveal whether the container remained on the vessel or sat on the dock between April 21 and April 25, 1988, the period in which the container remained in the carrier's custody.

The Bex trucker who received the container at the port on April 25, 1988 signed a Trailer Interchange Receipt ("T.I.R.") which denoted that there were some scratches and dents on the front and sides of the container (deft's exh. L). There was no indication, however, according to the T.I.R., of any holes or similar breaches in the integrity of the container. (Id.)

On or about that same day, the container doors were opened at the Bex warehouse. Bags of citric acid were found on the floor with empty pallets lying on top (see plft's exh. 8, letter from Bex to Rit-Chem). Wayne Ritell ("Ritell"), sales manager for Rit-Chem, testified that upon his arrival at the warehouse on April 28, 1988, the stow was in disarray and in a dampened condition. Moreover, an odor emanated from the cargo (Tr. 23, 26). Several of the bags were found broken open and citric acid was scattered on the floor of the container (plft's exh. 12; plft's exh. 5, photograph Nos. 26 and 28). Because of the poor condition of the stow, the warehouse employees had difficulty unloading the container (Tr. 415). Rit-Chem, in turn, rejected the entire cargo as not fit for edible consumption and subsequently sold it as salvage to the highest bidder for $9,228.14 (Tr. 44, 184; plft's exhs. 6, 7).

It is important to note that while the container was in the care and custody of plaintiff at the Bex warehouse, weather data compiled by the National Oceanic and Atmospheric Administration disclose that heavy rains were experienced in the vicinity (plft's exh. 9). In point of fact, the container doors were left open and the citric acid was exposed to the rain. See deft's exh. E, letter dated May 10, 1988 from plaintiff's marine surveyor Captain Andreas Spiridonakos ("Spiridonakos")[5] to

---

2. A house-to-house shipment indicates that the shipper had responsibility for loading and sealing the container. This factor is important because it demonstrates that the carrier had no opportunity to inspect the container or its contents prior to loading aboard the vessel. Tr. 186.

3. The abbreviated term C.I.F. signifies that the invoice price quoted includes cost, insurance and freight.

4. See, e.g., Aetna Ins. v. General Terminals, 1969 A.M.C. 2449; Schuyler v. Cunard S.S. Co., 1967 A.M.C. 896; see also n. 2 supra.

5. Captain Spiridonakos was hired by plaintiff's insurance company, American International Underwriters, to inspect and report on the condition of the cargo. Generally, a cargo survey is conducted jointly with surveyors from both sides in attendance. After several attempts at a joint survey failed, the surveyors attended the container separately.

Rit–Chem stating, "... for the last two weeks the shipment has been left in the open[,] container exposed to weather changes with considerable risk of deterioration." Thus, even assuming *arguendo* the container had small holes, the majority of the water damage, the court finds, occurred when the doors of the container were left open by plaintiff's agent at the Bex warehouse.

On April 26, 1988 Spiridonakos examined the container. He said that the container was in very poor condition, and had structural damage including holes and loose seams. Continuing, Spiridonakos testified that a hole on the right side of the container was "[l]arge enough to stick [his] finger through it." (Tr. 170). He also noted a hole on the upper left side of the container which, in his opinion, was incorrectly covered, and a loose left roof seam that allowed for the entry of water (Tr. 272). In addition, Spiridonakos observed rust streaks and water damaged bags inside the container. Spiridonakos opined that the stowage of the bags inside the container was improper but that the pallets had not shifted during the voyage (Tr. 205–06, 213).

Defendant's surveyor Willard F. Woytowick ("Woytowick") examined the container on May 9 and again on May 13, 1988. Contrary to plaintiff's surveyor, he reported that the container was sound, was without any problems, and was suitable for transporting the cargo (Tr. 371). Woytowick testified that he found holes on the left and right sides of the container, but that these holes had been securely patched, and that the metallic patches which covered the holes would not allow for direct water entry into the container (Tr. 354–60).

Furthermore, defendant's surveyor conducted two tests, a light test and a knife test, for the purpose of evaluating the watertightness of the container. The light test revealed that when the container was completely sealed there was no evidence of light entering the container through the roof, holes, seams or patches (Tr. 348, 356–58). The knife test disclosed that the seams between the roof and the side walls were intact, not loose, as plaintiff contends. Woytowick's report concluded "that while the container was less then [sic] 'Tip–Top' shape, that same appeared to be relatively 'Sound & Seaworthy.'" (Deft's exh. H).

Woytowick's report also indicated that the dampness in the container resulted from condensation[6] and not from a direct intrusion of water into the container (*Id.;* Tr. 350). Indeed, mud found on the inside door of the container by defendant's surveyor indicates that the container may have been loaded in a wet and muddy environment (Tr. 352). Additionally, water stains were discovered on the wooden pallets inside the container, even though the pallets were stowed in the second tier of the container, suggesting that moisture may have been introduced into the container before loading (Tr. 425).

The court agrees with Woytowick's assessment concerning the seaworthiness of the container and hence finds the container was watertight. The roof seam was sound and did not show leakage of water, as plaintiff maintains. Additionally, there were no rust stains below the area where plaintiff contends the seam leaked. Moreover, as we have seen, defendant's surveyor conducted both a knife test, which did not reveal a loose seam, and a light test, which indicated no light had entered the sealed container.

Plaintiff's contentions as to the holes in the left and right side of the container walls, similarly, should be discounted. The integrity of the patch over the hole on the

---

**6.** Plaintiff attempted to discredit Woytowick's testimony concerning the condensation in the container merely because he was unable to discuss scientifically the properties of condensation. *Webster's New Collegiate Dictionary* (5th ed. 1977), defines condensation:

    a chemical reaction involving union between molecules often with elimination of a simple molecule (as water) to form a new more com-

plex compound of often greater molecular weight.

The court finds inconsequential Woytowick's inability to discuss the technical aspects of condensation, especially considering that condensation is a problem generally in the shipping industry, occurring frequently in water damage cases, and that Woytowick has demonstrated a familiarity with the problem (Tr. 426–27).

left side is amply demonstrated through photographs (deft's exh. H, photograph No. 5; plft's exh. 5, photograph Nos. 2, 21), and by the credible testimony of Woytowick. The short of the matter is that the *photographs simply do not show a hole in the areas where plaintiff contends a hole exists.* At most, a pinhole existed which was visible only when the patched area was peeled back (Tr. 360).

Plaintiff argues further that there was a breach in the integrity of the container in the rusty area below the aforementioned patch (plft's exh. 5, photograph Nos. 2, 21). The court, though, does not find this area to be a source of water entry into the container. The photographs depict only a general area of rust and do not depict rust stains of the type that would be caused by water dripping from a hole or seam.[7] Consequently, the court concludes that no breach in the integrity of the container existed in this area.

Plaintiff relies on a photograph taken by its surveyor to demonstrate that an unpatched hole existed on the right side of the container, immediately next to a patched hole (plft's exh. 12, photograph No. 18). However, the area in dispute is no more than a dark spot created by a shadow cast by the patch. It is not, as plaintiff insists, a hole. A small hole did exist under the patched area, but the container remained watertight due to the patch (Tr. 355; deft's exh. I, photograph No. 10).

Another factor that leads the court to credit Woytowick's testimony is his assertion that the different colors on the interior walls of the container are not evidence of water stains from the roof seam, as plaintiff's surveyor maintains, but rather the result of the container having been repainted. The photographs clearly demonstrate that the container was painted in two distinct colors, turquoise and tan, and that the

alleged water stains do not exist (Tr. 368, 450; plft's exh. 5, photograph No. 21).[8]

Significantly, in the various communications that plaintiff had with the shipper and with its underwriter between May 2 and May 16, 1988 regarding the damage to the citric acid, no allegations were ever made by plaintiff as to any defects regarding the container (deft's exhs. A–E). In addition, Sheikh Bakker, the claims manager for Pharos' agent, Constellation Navigation, testified that the container was subsequently used in two ocean voyages without complaint and without any cargo claims being filed for water damage to the contents of the container—one of the shipments consisting of cotton garments (Tr. 486, 495–96). More, the container remained watertight when inspected one year later by Frank Reilly, an independent cargo surveyor, although no major repair work had been performed on the container (Tr. 434–37, 490–491).

Rit–Chem claims a monetary loss due to the strong foreign odor of the cargo, which plaintiff contends, compelled it to reject the entire shipment and offer it for salvage. Nevertheless, a laboratory analysis of the product, revealed that there was no contamination by bacteria, molds or yeast (plft's exh. 13). The samples sent to the laboratory for analysis were reported to be edible food grade. No evidence was elicited at trial concerning the source or cause of the odor as plaintiff's surveyor deemed the extensive chemical tests too costly (Tr. 265).

### Conclusions of Law

Plaintiff's cause of action is governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300 *et seq.* (1982 & Supp. V 1987). Section 1303 reads in pertinent part as follows:

Responsibilities and liabilities of carrier and ship

(1) Seaworthiness

---

7. Rust is common inside containers due to the loading and unloading of cargo in port areas and is not indicative of a breach in the container; rust may, however, be caused by condensation that forms inside the container.

8. It is not uncommon for containers that have undergone substantial repairs to have their interiors repainted in part or in whole, and containers are periodically repaired and repainted to prevent rust. Judging from plft's exh. 5, photograph No. 21, in the instant case this appears to be exactly what happened.

The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

    (a) Make the ship seaworthy;

\*    \*    \*    \*    \*    \*

    (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

(2) Cargo

The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

Under COGSA, the shipper or consignee "has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" *Caemint Foods, Inc. v. Brasileiro*, 647 F.2d 347, 351 (2d Cir.1981) (Friendly, J.) (quoting *Pan–American Hide Co. v. Nippon Yusen (Kabushiki) Kaisha*, 13 F.2d 871, 871 (S.D.N.Y.1921) (L. Hand, J.)); *cited in Travelers Indem. Co. v. S/S Sikorski*, 716 F.Supp. 1, 2 (S.D.N.Y.1989), *aff'd mem.*, 896 F.2d 543 (2d Cir.1990). A shipper or consignee can meet this burden by proving delivery of the goods to the carrier in good condition and outturn by the carrier in damaged condition. *English Elec. Valve Co. v. M/V Hoegh Mallard*, 814 F.2d 84, 87 (2d Cir.1987); *Madow Co. v. S.S. Liberty Exporter*, 569 F.2d 1183, 1185 (2d Cir.1978); *Vana Trading Co. v. S.S. Mette Skou*, 556 F.2d 100, 104 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

■ Plaintiff incorrectly contends that its burden of proof is met by producing a clean bill of lading. A bill of lading may be *prima facie* evidence that the cargo was delivered in good condition to the carrier. However, "recitals of apparent good order and condition in a bill of lading do not inevitably satisfy the shipper's burden of showing that the damaged goods were in fact in such condition when shipped," and a clean bill of lading will not satisfy the burden when dealing with cargo that is containerized by the shipper and loaded on the vessel without the involvement, observation or inspection of the carrier. *Ca-*

*emint*, 647 F.2d at 352–53; *see also A.J. Cunningham Packing v. M/V Australian Exporter*, 719 F.Supp. 258, 260 (S.D.N.Y. 1989); *Insurance Co. of North America v. S.S. Italica*, 567 F.Supp. 59, 61 (S.D.N.Y. 1983); *Recumar, Inc. v. Dana Arabia*, 1985 A.M.C. 2284, 2288, 1985 WL 479. It is fair to impose this burden on plaintiff because the shipper "has superior access to information as to the condition of goods when delivered to the carrier." *Caemint*, 647 F.2d at 354 (quoting *Commodity Service Corp. v. Hamburg–American Line*, 354 F.2d 234 (2d Cir.1965).

■ Here, the citric acid was sealed in a house to house container by the shipper before delivery to defendant. Defendant had no knowledge of the condition of or opportunity to inspect the cargo in the sealed container. The only evidence submitted by plaintiff that the cargo was in apparent good order and condition is a belated telex from the shipper to Rit–Chem stating that based on the shipper's records there were no problems with the shipment and that the container had been properly loaded. But the telex does not mention any direct observation or inspection of the cargo. Moreover, the telex is a self-serving communication from the shipper to the plaintiff to which the court accords little weight. In addition, plaintiff did not introduce any of the shipper's records, nor does any other credible evidence exist to support plaintiff's contention that the cargo was in good condition when delivered to defendant. Accordingly, plaintiff has failed to satisfy its burden regarding proof that the citric acid was delivered to defendant in good condition.

A consignee who has not proved delivery to the carrier in good condition may nevertheless establish a *prima facie* case by producing sufficient evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody. *Kanematsu–Gosho, Ltd. v. Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir.1987); *Caemint*, 647 F.2d at 355; *Elia Salzman Tobacco Co. v. S.S. Mormacwind*, 371 F.2d 537 (2d Cir.1967); *A.J. Cunningham Packing*, 719 F.Supp. at

260; *Goya Foods v. S.S. Italica,* 561 F.Supp. 1077, 1082 (S.D.N.Y.1983), *aff'd mem.,* 742 F.2d 1434 (2d Cir.1983). Plaintiff has attempted to bring itself within this exception by showing that the cargo damage was due to the poor physical condition of the container which allowed for the entry of water.

After reviewing all of the evidence concerning the condition of the container, the court determines that plaintiff has failed to prove by a preponderance of the evidence that the cargo damage was due to the poor physical condition of the container. Indeed, the court finds the container was watertight and suitable for ocean voyage. The patches on the exterior container walls were adequate to prevent water entry and no holes existed inside the container which extended to the exterior. In sum, there was no evidence of water entry into the container through any holes, seams or patches.

Concerning the ocean voyage, the fact that the container was stowed below the deck of the vessel, where exposure to rain or sea water was negligible, destroys plaintiff's allegation that the water damage occurred during transport.

Evidence does exist that the container may have been loaded in a wet and muddy environment. This conclusion is supported by the mud and rock debris on the outside of the container and by the mud splattered on the inside door of the container. It is therefore reasonable to conclude that moisture may have entered the container before delivery to the carrier and not during the voyage. Additionally, the absence of a localized area of damage to the cargo, where water damage to the bags would be extensive and concentrated, weakens the inference that holes in the sides of the container allowed entry of water. Finally, the record establishes beyond peradventure that the container doors were left open by plaintiff's agent and the cargo exposed to a substantial amount of rain after delivery to the consignee's warehousing facility.

Consequently, plaintiff has failed to establish its *prima facie* case of liability against defendant. As a result, the court does not reach the issue of whether defendant exercised due diligence. And, in any event, even assuming plaintiff managed to prove liability on the part of defendant, plaintiff failed to properly mitigate its damages by carelessly leaving the container doors open and the cargo exposed to the elements. Thus the court finds that defendant is not liable.

Accordingly, the clerk of the court shall enter a judgment dismissing the complaint. Each party shall bear its respective costs.